*775 Opinion by Judge FISHER; Concurrence by Judge NGUYEN; Dissent by Judge TALLMAN; Dissent by Judge O’SCANNLAIN.
OPINION
FISHER, Circuit Judge, with whom KOZINSKI, Chief Judge, and THOMAS, McKEOWN, BERZON, BYBEE, M. SMITH and NGUYEN, Circuit Judges, join in full, and with whom WATFORD, Circuit Judge, joins except as to section III.B.2:
Arizona law categorically forbids granting undocumented immigrants arrested for a wide range of felony offenses any form of bail or pretrial release, even if the particular arrestee is not a flight risk or dangerous. We must decide whether such an absolute denial comports with the substantive component of the Due Process Clause of the Fourteenth Amendment. We hold that it does not.
I.
In 2006, Arizona voters overwhelmingly approved an amendment to their state constitution known as Proposition 100.[1] Proposition 100 mandates that Arizona state courts may not set bail “[f]or serious felony offenses as prescribed by the legislature if the person charged has entered - or remained in the United States illegally and if the proof is evident or the presumption great as to the present charge.” Ariz. Const, art. 2, § 22(A)(4). In a separate enactment, the Arizona legislature defined “serious felony offenses” as any class 1, 2, 3 or 4 felony or aggravated driving-under-the-influence offense. See Ariz.Rev.Stat. Ann. § 13-3961(A)(5)(b).
The Proposition 100 bail determination is made at an initial appearance, which under Arizona law occurs within 24 hours of arrest. See Ariz. R.Crim. P. 4.1(a). At the initial appearance, the court must deny bail, irrespective of whether the arrestee poses a flight risk or a danger to the community, “if the court finds (1) that the proof is evident or the -presumption great that the person committed a serious offense, and (2) probable cause that the person entered or remained in the United States illegally.” Ariz. R.Crim. P. 7.2(b). An arrestee deemed ineligible for bail at the initial appearance may move for reexamination, and a hearing on such motion “shall be held on the record as soon as practicable but not later than seven days after filing of the motion.” Ariz. R.Crim. P. 7.4(b). At the follow-up proceeding, known as a Simpson/Segura hearing, see Simpson v. Owens, 207 Ariz. 261, 85 P.3d 478 (Ariz.Ct.App.2004); Segura v. Cunanan, 219 Ariz. 228, 196 P.3d 831 (Ariz.Ct. App.2008), the arrestee can dispute whether there is probable cause that he or she entered or remained in the United States illegally, but may not refute Proposition 100’s irrebuttable presumption that he or she poses an unmanageable flight risk. Once the court determines that there is probable cause to believe an arrestee has entered or remained in the United States unlawfully, the court has no discretion to release the arrestee under any circumstances, even if the court would find — and the state would concede — that the particular arrestee does not pose a flight risk or danger to the community.
In 2008, plaintiffs Angel Lopez-Valenzuela and Isaac Castro-Armenta filed a class action complaint against Maricopa County, the Maricopa County Sheriff, the Maricopa County Attorney and the Presiding Judge of the Maricopa County Superi- or Court, challenging the constitutionality of Proposition 100 and its implementing *776 laws and rules (“the Proposition 100 laws”). At the time the complaint was filed, both plaintiffs were charged with state crimes and held in Maricopa County-jails as a result of orders finding that they had entered or remained in the United States illegally. The complaint proposed a plaintiff class consisting of “All persons who have been or will be held ineligible for release on bond by an Arizona state court in Maricopa County pursuant to Section 22(A)(4) of the Arizona Constitution and Ariz.Rev.Stat. § 13-3961(A)(5).”
The plaintiffs alleged that the Proposition 100 laws violate the United States Constitution in a number of ways. As relevant here, they alleged that the Proposition 100 laws violate the substantive due process guarantees of the Fourteenth Amendment on two theories: (1) arrestees have a liberty interest in being eligible for release on bond pending resolution of criminal charges and the Proposition 100 laws are not narrowly tailored to serve a compelling governmental interest; and (2) the laws impermissibly impose punishment before trial. The plaintiffs also alleged violations of the procedural due process guarantees of the Fourteenth Amendment, the Fifth Amendment right against selfincrimination, the Sixth Amendment right to counsel, the Excessive Bail Clause of the Eighth Amendment and the Supremacy Clause, alleging that the Proposition 100 laws are preempted by federal law. They sought an order declaring the Proposition 100 laws unconstitutional, enjoining the enforcement of those laws and affording each of them an individualized bail hearing at which they may be considered for release, taking into account particularized facts about whether release would pose an unacceptable risk of flight or danger to the community.
In a December 2008 order, the district court granted the plaintiffs’ motion for class certification, certifying a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure. The court also granted the defendants’ motion to dismiss the plaintiffs’ preemption claims under Rule 12(b)(6).
The parties filed cross motions for summary judgment. In a March 2011 order, the district court denied the plaintiffs’ motion for summary judgment and granted the defendants’ motion for partial summary judgment on the plaintiffs’ substantive due process, procedural due process, Eighth Amendment and Sixth Amendment claims. See Fed.R.Civ.P. 56. The plaintiffs thereafter voluntarily dismissed their Fifth Amendment claim. The district court then entered a final judgment, from which the plaintiffs timely appealed, challenging the Rule 12(b)(6) dismissal of their preemption claims and the adverse summary judgment rulings on their substantive due process, procedural due process, Eighth Amendment and Sixth Amendment claims.
After a divided three judge panel of this court affirmed the judgment of the district court, a majority of nonrecused active judges voted in favor of rehearing en banc. See Lopez-Valenzuela v. Cnty. of Maricopa, 719 F.3d 1054, 1073 (9th Cir.2013), reh’g en banc granted, 741 F.3d 1015 (9th Cir.2014). We have jurisdiction under 28 U.S.C. § 1291, and we now reverse.[2]
*777 II.
We review de novo a district court’s grant or denial of summary judgment. See Russell Country Sportsmen v. U.S. Forest Serv., 668 F.3d 1037, 1041 (9th Cir.2011). We also review de novo a district court’s grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). See Cousins v. Lockyer, 568 F.3d 1063, 1067 (9th Cir.2009). We review a challenge to the constitutionality of a statute de novo as well. See United States ¶. Gonzales, 307 F.3d 906, 909 (9th Cir.2002).
III.
The plaintiffs contend that the Proposition 100 laws violate substantive due process. We agree.
A.
The Supreme Court has long recognized constitutional limits on pretrial detention. The Court has prohibited excessive bail, see Stack v. Boyle, 342 U.S. 1, 4-5, 72 S.Ct. 1, 96 L.Ed. 3 (1951), required a judicial determination of probable cause within 48 hours of arrest, see Cnty. of Riverside v. McLaughlin, 500 U.S. 44, 56, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991); Gerstein v. Pugh, 420 U.S. 103, 114, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), barred punitive conditions of pretrial confinement, see Bell v. Wolfish, 441 U.S. 520, 535-37, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), prohibited pretrial detention as punishment, see United States v. Salerno, 481 U.S. 739, 746-48, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); Schall v. Martin, 467 U.S. 253, 269-74, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984), and held that restrictions on pretrial release of adult arrestees must be carefully limited to serve a compelling governmental interest, see Salerno, 481 U.S. at 748-51, 107 S.Ct. 2095.
In the first of these cases, Stack v. Boyle, the Court observed that the “traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction.” 342 U.S. at 4, 72 S.Ct. 1. The Court noted that, “[u]nless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning,” id., and it held that “[b]ail set at a figure higher than an amount reasonably calculated to fulfill [its] purpose [of assuring the presence of the accused at trial] is ‘excessive’ under the Eighth Amendment,” id. at 5, 72 S.Ct. 1.
In Gerstein v. Pugh, the Court recognized that “[p]retrial confinement may imperil the suspect’s job, interrupt his source of income, ... impair his family relationships” and affect his “ability to assist in preparation of his defense.” 420 U.S. at 114, 123, 95 S.Ct. 854. The Court held “that the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest.” Id. at 114, 95 S.Ct. 854. This probable cause determination is “necessary to effect limited postarrest detention,” Salerno, 481 U.S. at 752, 107 S.Ct. 2095, and ordinarily must occur within 48 hours of arrest, see McLaughlin, 500 U.S. at 56, 111 S.Ct. 1661.
A few years later, in Bell v. Wolfish, the Court emphasized that, “under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt.” 441 U.S. at 535, 99 S.Ct. 1861. Accordingly, the Court held that “the Due *778 Process Clause protects a detainee from ... conditions and restrictions of pretrial detainment” that “amount to punishment of the detainee.” Id. at 533, 535, 99 S.Ct. 1861. The Court outlined a two-pronged test for determining when conditions and restrictions of pretrial detention amount to punishment, focusing first on whether the restrictions were imposed for a punitive purpose and, if not, on whether the restrictions are excessive in relation to a legitimate regulatory purpose:
A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it. Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to “punishment.” Conversely, if a restriction or condition is not reasonably related to a legitimate goal — if it is arbitrary or purposeless — a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees.
Id. at 538-39, 99 S.Ct. 1861 (alterations, footnotes, citations and internal quotation marks omitted).
Five years later, in Schall v. Martin, the Court considered the substantive due process implications of a state law authorizing pretrial detention of juvenile offenders found to present “a serious risk” of committing a crime pending their juvenile court proceedings. 467 U.S. at 255, 104 S.Ct. 2403. As it would later do in Salerno, the Court applied a two-part substantive due process inquiry. First, relying on general due process principles, the Court considered whether the law constituted an impermissible infringement of the juveniles’ liberty interest. See Schall, 467 U.S. at 263-68, 104 S.Ct. 2403. The Court recognized that juveniles have a “substantial” interest in “freedom from institutional restraints,” id. at 265, 104 S.Ct. 2403, but that interest had to be “qualified by the recognition that juveniles, unlike adults, are always in some form of custody,” id. Accordingly, in lieu of heightened scrutiny, the Court required the state to show only that the challenged law served a “legitimate interest.” Id. at 266, 104 S.Ct. 2403. This standard was satisfied because “[s]ociety has a legitimate interest in protecting a juvenile from the consequences of his criminal activity — both from potential physical injury which may be suffered when a victim fights back or a policeman attempts to make an arrest and from the downward spiral of criminal activity into which peer pressure may lead the child.” Id.
Second, relying on the two-pronged test articulated in Bell, the Court considered whether the challenged law violated substantive due process by imposing confinement as punishment. See id. at 269-74, 104 S.Ct. 2403. Applying the first prong of the Bell test, the Court found no evidence that the law was intended as punishment. See id. at 269, 104 S.Ct. 2403. Turning to the second prong, the Court concluded that the law was not excessive in relation to the state’s legitimate regulatory purpose in protecting juveniles from the consequences of their criminal activity, because the detention was “strictly limited in time” (to a maximum possible detention of 17 days) and the conditions of confinement were regulatory rather than punitive. Id. *779 at 269-71, 104 S.Ct. 2403. The Court also found persuasive that every state in the country permitted preventive detention of juveniles accused of crime, see id. at 267, 274, 104 S.Ct. 2403, citing “the widely shared legislative judgment that preventive detention serves an important and legitimate function in the juvenile justice system,” id. at 272,104 S.Ct. 2403.
Three years later, in United States v. Salerno, the Court rounded out this series of pretrial detention cases by considering the substantive due process implications of a federal law authorizing pretrial detention of adult arrestees. Salerno involved a challenge to a provision of the federal Bail Reform Act of 1984 requiring pretrial detention of arrestees charged with certain serious felonies if the government demonstrated by clear and convincing evidence after an adversary hearing that no release conditions “will reasonably assure ... the safety of any other person and the community.” 18 U.S.C. § 3142(e). As it had in Schall, the Court applied a two-part substantive due process inquiry, albeit in the reverse order.
First, relying on Bell and Schall, the Court considered whether the Act violated substantive due process by authorizing “punishment before trial.” Salerno, 481 U.S. at 746, 107 S.Ct. 2095. Under the first Bell prong, the Court found no evidence that Congress had authorized pretrial detention for a punitive purpose. See id. at 747, 107 S.Ct. 2095. Rather, Congress had authorized detention for the legitimate regulatory purpose of “preventing danger to the community.” Id. Turning to Bell’s second prong, the Court held that “the incidents of pretrial detention” were not “excessive in relation to the regulatory goal Congress sought to achieve,” because: (1) the Act “carefully limits the circumstances under which detention may be sought to the most serious of crimes,” including “crimes of violence, offenses for which the sentence is life imprisonment or death, serious drug offenses, or certain repeat offenders”; (2) “[t]he arrestee is entitled to a prompt detention hearing” at which the arrestee could seek bail; and (3) “the maximum length of pretrial detention is limited by the stringent time limitations of the Speedy Trial Act.” Id. Accordingly, the Court held “that the pretrial detention contemplated by the Bail Reform Act is regulatory in nature, and does not constitute punishment before trial in violation of the Due Process Clause.” Id. at 748, 107 S.Ct. 2095.
Second, as in Schall, the Court also applied general due process principles and considered whether the law constituted an impermissible infringement of arrestees’ liberty interest. See id. at 748-51, 107 S.Ct. 2095. Whereas Schall had applied a deferential standard of review, however, Salerno applied heightened scrutiny. The Court noted that, “[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.” Id. at 755, 107 S.Ct. 2095. It cited “the ‘general rule’ of substantive due process that the government may not detain a person prior to' a judgment of guilt in a criminal trial.” Id. at 749, 107 S.Ct. 2095. It recognized that the Act implicated “the individual’s strong interest in liberty.” Id. at 750, 107 S.Ct. 2095. And it was careful “not [to] minimize the importance and fundamental nature of this right.” Id. But the Court concluded that the Bail Reform Act satisfied heightened scrutiny because it both served a “compelling” and “overwhelming” governmental interest “in preventing crime by arrestees” and was “carefully limited” to achieve that purpose. Id. at 749-50, 755, 107 S.Ct. 2095. The Act was sufficiently tailored because it “carefully] delineated] ... the circumstances under which detention will be permitted.” Id. at 751,107 S.Ct. 2095. It: (1) “narrow *780 ly focuse[d] on a particularly acute problem in which the Government interests are overwhelming,” id. at 750, 107 S.Ct. 2095; (2) “operate[d] only on individuals who have been arrested for a specific category of extremely serious offenses” — individuals that “Congress specifically found” were “far more likely to be responsible for dangerous acts in the community after arrest,” id.; and (3) afforded arrestees “a full-blown adversary hearing” at which the government was required to “convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person,” id. It satisfied heightened scrutiny because it was a “carefully limited exception,” id. at 755, 107 S.Ct. 2095, not a “scattershot attempt” at preventing crime by arrestees, id. at 750,107 S.Ct. 2095.
B.
Salerno and Sehall establish the substantive due process framework that governs here. We first consider whether the Proposition 100 laws satisfy general substantive due process principles. Because the Proposition 100 laws regulate adults rather than juveniles, we apply Salerno’s heightened scrutiny rather than Schall’s more deferential review. We then consider in the alternative whether the Proposition 100 laws violate due process, under Bell, Sehall and Salerno, by imposing punishment before trial. To succeed on their facial challenge, the plaintiffs must show that the Proposition 100 laws are unconstitutional in all of their applications. See Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) (citing Salerno, 481 U.S. at 745, 107 S.Ct. 2095); see also id. (“While some Members of the Court have criticized the Salerno formulation, all agree that a facial challenge must fail where the statute has a plainly legitimate sweep.” (internal quotation marks omitted)); United States v. Stevens, 559 U.S. 460, 472,130 S.Ct. 1577,176 L.Ed.2d 435 (2010).
1.
We first consider whether the Proposition 100 laws satisfy general substantive due process principles.
The governing substantive due process standard is a familiar one. “The Due Process Clause ... provides heightened protection against government interference with certain fundamental rights and liberty interests,” Washington v. Glucksberg, 521 U.S. 702, 719-20, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997), “forbidding] the government to infringe certain ‘fundamental’ liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest,” Reno v. Flores, 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993).
We apply heightened scrutiny here because the Proposition 100 laws infringe a “fundamental” right. Salerno, 481 U.S. at 750, 107 S.Ct. 2095. The defendants’ brief suggests that the Proposition 100 laws do not implicate a fundamental right, because “[b]ail ... is not a fundamental ... constitutional right,” but Salerno made clear that what is at stake here is “the individual’s strong interest in liberty,” and the Court was careful “not [to] minimize the importance and fundamental nature of this right.” Id. (emphasis added). If there was any doubt about the level of scrutiny applied in Salerno, it has been resolved in subsequent Supreme Court decisions, which have confirmed that Salerno involved a fundamental liberty interest and applied heightened scrutiny. See Flores, 507 U.S. at 301-02, 113 S.Ct. 1439; id. at 316, 113 S.Ct. 1439 (O’Connor, J., concur *781 ring); Foucha v. Louisiana, 504 U.S. 71, 80-88, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992); id. at 93, 112 S.Ct. 1780 (Kennedy, J., dissenting). Salerno and the cases that have followed it have recognized that “[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.” Foucha, 504 U.S. at 80, 112 S.Ct. 1780. Thus, “[t]he institutionalization of an adult by the government triggers heightened, substantive due process scrutiny.” Flores, 507 U.S. at 316, 113 S.Ct. 1439 (O’Connor, J., concurring). As the Court explained in Salerno, 481 U.S. at 755, 107 S.Ct. 2095, “liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.” See also Zadvydas v. Davis, 533 U.S. 678, 690, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) (“Freedom from imprisonment — from government custody, detention, or other forms of physical restraint — lies at the heart of the liberty that [the Due Process] Clause protects.”); Foucha, 504 U.S. at 90, 112 S.Ct. 1780 (Kennedy, J., dissenting) (“As incarceration of persons is the most common and one of the most feared instruments of state oppression and state indifference, we ought to acknowledge at the outset that freedom from this restraint is essential to the basic definition of liberty in the Fifth and Fourteenth Amendments of the Constitution.”). Thus, the Proposition 100 laws will satisfy substantive due process only if they are “narrowly tailored to serve a compelling state interest.” Flores, 507 U.S. at 302, 113 S.Ct. 1439 (citing Salerno, 481 U.S. at 746,107 S.Ct. 2095).[3]
That the Proposition 100 laws regulate persons when there is probable cause to' believe they have “entered or remained in the United States illegally,” Ariz. Const, art. 2, § 22(A)(4), does not alter the analysis, as the defendants concede. The Due Process Clauses of the Fifth and Fourteenth Amendments protect every person within the nation’s borders from deprivation of life, liberty or property without due process of law. See Mathews v. Diaz, 426 U.S. 67, 77, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976). “Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection.” Id.[4]
We also bear in mind that, regardless of whether an arrestee is a citizen, a lawful resident or an undocumented immigrant, the costs to the arrestee of pretrial detention are profound. “Pretrial confinement may imperil the suspect’s job, interrupt his source of income, and impair his family relationships.” Gerstein, 420 U.S. at 114, 95 S.Ct. 854. And it may affect “the defendant’s ability to assist in preparation of his defense.” Id. at 123, 95 S.Ct. 854. As the Supreme Court stated in Stack, 342 U.S. at 4, 72 S.Ct. 1, the “traditional right to freedom before conviction permits the unhampered preparation of a defense.” See also ABA Standards for Criminal Justice: Pretrial Release 29 (3d. ed.2007) (citing “considerable evidence that pretrial custody status is associated with the ultimate outcomes of cases, with released defendants consistently faring better than defendants in detention”).
*782 In this case, the defendants argue that the Proposition 100 laws satisfy substantive due process because they serve the state’s substantial interest in ensuring that persons accused of crimes are avail-’ able for trial. They argue that pretrial detention is a constitutionally acceptable means of furthering that interest. And they contend that Proposition 100’s categorical denial of bail to undocumented immigrants, without any individualized determination of flight risk, is justified because undocumented immigrants in general pose an unmanageable flight risk. The district court accepted this rationale, concluding that “[t]he Arizona legislature and Arizona voters made the logical assumption that a person who is unlawfully present in the United States may not appear for trial.” We disagree.
We do not question that Arizona has a compelling interest in ensuring that persons accused of serious crimes, including undocumented immigrants, are available for trial. See Salerno, 481 U.S. at 749,107 S.Ct. 2095 (noting that “an arrestee may be incarcerated until trial if he presents a risk of flight”); Bell, 441 U.S. at 534, 99 S.Ct. 1861 (recognizing the government’s “substantial interest in ensuring that persons accused of crimes are available for trials and, ultimately, for service of their sentences,” and “that confinement of such persons pending trial is a legitimate means of furthering that interest”). The plaintiffs properly conceded this point at oral argument.
We do, however, reject the proposition that the Proposition 100 laws are carefully limited, as Salerno requires. Salerno concluded that the challenged provisions of the Bail Reform Act satisfied the tailoring requirement of heightened scrutiny because they created a “narrowly focuse[d],” “carefully limited exception” to the “ ‘general rule’ of substantive due process that the government may not detain a person prior to a judgment of guilt in a criminal trial.” Salerno, 481 U.S. at 749-50, 755, 107 S.Ct. 2095 (emphasis added). The Act thus satisfied the heightened scrutiny standard because Congress had chosen a “careful delineation of the circumstances under which detention will be permitted” rather than adopting a “scattershot attempt” at advancing the government’s interest in preventing crime by arrestees. Id. at 750-51, 107 S.Ct. 2095 (emphasis added).
In holding the Act sufficiently tailored to satisfy heightened scrutiny, Salerno focused on three considerations. First, that the challenged provisions addressed “a particularly acute problem.” Id. at 750, 107 S.Ct. 2095. Second, that “[t]he Act operates only on individuals who have been arrested for a specific category of extremely serious offenses,” where Congress had “specifically found that these individuals are far more likely to be responsible for dangerous acts in the community after arrest.” Id. Third, that the Act required “a full-blown adversary hearing” at which the government was required to “convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person.” . Id. None of those considerations exist here.
a. The Proposition 100 Laws Do Not Address a Particularly Acute Problem.
First, the record does not support the argument that the Proposition 100 laws addressed “a particularly acute problem.” Salerno, 481 U.S. at 750, 107 S.Ct. 2095. The Bail Reform Act at issue in Salerno addressed an “alarming problem of crimes committed by persons on release.” Id. at 742, 107 S.Ct. 2095 (quoting S.Rep. No. 98-225, at 3 (1983), reprinted in 1984 *783 U.S.C.C.A.N. 3182, 3185) (internal quotation marks omitted). The record in Salerno contained empirical evidence establishing that the legislation addressed “a pressing societal problem,” id. at 747, 107 S.Ct. 2095 (citing S.Rep. No. 98-225, at 4-8, 1984 U.S.C.C.A.N. at 3186-91), and the law operated only on individuals “Congress specifically found ... are far more likely to be responsible for dangerous acts in the community after arrest,” id. at 750, 107 S.Ct. 2095 (citing S.Rep. No. 98-225, at 6-7, 1984 U.S.C.C.A.N. at 3188-90). This evidence figured prominently in the Court’s decision to uphold the Bail Reform Act.
Similarly, in Demore v. Kim, 538 U.S. 510, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003), where the Court upheld a federal immigration statute providing for mandatory detention of certain convicted criminal aliens during the brief period of their civil removal proceedings, the record contained evidence that the legislation addressed a particularly acute problem. The Court emphasized and discussed at length the considerable evidence in the record, much of it quantitative, showing that the legislation applied to persons who were both dangerous and at risk of flight. See id. at 518-21, 528,123 S.Ct. 1708.[5]
Here, there is no evidence that the Proposition 100 laws were adopted to address a particularly acute problem. In contrast to Salerno and Demore, the record contains no findings, studies, statistics or other evidence (whether or not part of the legislative record) showing that undocumented immigrants as a group pose either an unmanageable flight risk or a significantly greater flight risk than lawful residents. The absence of such evidence both distinguishes this case from Salerno and supports the conclusion that Proposition 100 laws are not carefully limited, as they must be to survive heightened scrutiny under Salerno.[6]
*784 Contrary to Judge Tallman’s reading of our opinion, we neither “demand” findings, studies, statistics or other evidence showing that undocumented immigrants pose an unmanageable flight risk nor impose an “empirical data requirement” on the defendants. Dissent at 802-03. We do not hold Proposition 100 “void ... for want of evidence,” Nixon v. Shrink Mo. Gov’t PAC, 528 U.S. 377, 391, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000), but rather that the Proposition 100 laws are not “carefully limited” under Salerno. Whether Proposition 100 “narrowly focuses on a particularly acute problem” is part of that inquiry. Salerno, 481 U.S. at 750, 107 S.Ct. 2095; see also Foucha, 504 U.S. at 81, 112 S.Ct. 1780. Thus, although we do not require the defendants to produce evidence or point to legislative findings, the absence of any credible showing that the Proposition 100 laws addressed a particularly acute problem is one factor quite relevant to demonstrating that the laws are not carefully limited.
b. The Proposition 100 Laws Are Not Limited to a Specific Category of Extremely Serious Offenses.
Second, the Proposition 100 laws are not limited to “a specific category of extremely serious offenses.” Salerno, 481 U.S. at 750, 107 S.Ct. 2095; cf. Demore, 538 U.S. at 517-18, 123 S.Ct. 1708, Kansas v. Hendricks, 521 U.S. 346, 357, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997). Instead, they encompass an exceedingly broad range of offenses, including not only serious offenses but also relatively minor ones, such as unlawful copying of a sound recording, altering a lottery ticket with intent to defraud, tampering with a computer with the intent to defraud and theft of property worth between $3,000 and $4,000.
c. The Proposition 100 Laws Do Not Require a Full-blown Adversary Hearing at Which the State Is Required to Prove that an Individual Arrestee Presents an Unmanageable Flight Risk.
Finally, even if some undocumented immigrants pose an unmanageable flight risk or undocumented immigrants on average pose a greater flight risk than other arrestees, Proposition 100 plainly is not carefully limited because it employs an over-broad, irrebuttable presumption rather than an individualized hearing to determine whether a particular arrestee poses an unmanageable flight risk. In Salerno, the regulatory scheme was limited to arrestees who actually posed a danger to the community. First, it was limited to “individuals who have been arrested for a specific category of extremely serious offenses” — who Congress found were “far more likely to be responsible for dangerous acts in the community after arrest.” Salerno, 481 U.S. at 750, 107 S.Ct. 2095. Second, even for arrestees falling within that specific category, the scheme provided case-by-case determinations of the need for pretrial detention. Each arrestee was entitled to a “full-blown adversary hear *785 ing,” at which the government was required to prove by “clear and convincing evidence” that the individual presented “a demonstrable danger to the community” and that “no conditions of release c[ould] reasonably assure the safety of the community.” Id. It was only “[u]nder these narrow circumstances” that the Court held that society’s interest was sufficient to outweigh the “individual’s strong interest in [pretrial] liberty.” Id.
In contrast, Proposition 100 is not narrowly focused on those arrestees who actually pose the greatest flight risk. Demonstrably, many undocumented immigrants are not unmanageable flight risks. The record includes examples of undocumented immigrants who were arrested before Proposition 100, granted bail or released on their own recognizance, and appeared at their court dates and trials. Yet even these individuals were needlessly remanded into state custody following Proposition 100’s passage.
In Hernandez v. Lynch, 216 Ariz. 469, 167 P.3d 1264 (Ariz.Ct.App.2007), for example, police found a social security card and a resident alien card in Hernandez’s wallet after arresting him for possessing an open container of alcohol within the passenger compartment of a motor vehicle. See id. at 1265. Hernandez admitted that the cards were forged, that he had purchased them for $5,000 and that he had procured them in order to work and buy food. See id. at 1266. The state charged him with two counts of knowingly possessing forged instruments with intent to defraud, a class 4 felony. See id. He was released on his own recognizance after an initial appearance hearing. When he appeared voluntarily for his preliminary hearing, however, he was automatically denied bail by operation of Proposition 100. See id. He ultimately pled guilty to solicitation to commit- forgery, a class 6 felony, and was placed on probation for one year. See id. Proposition 100 categorically eliminates any opportunity for persons such as Mr. Hernandez to show that, notwithstanding their immigration status, they do not pose a flight risk. Indeed, it mandates pretrial detention even when the state concedes that the arrestee does not pose a flight risk.[7]
Whether a categorical denial of bail for noncapital offenses could ever withstand heightened scrutiny is an open question. See United States v. Scott, 450 F.3d 863, 874 (9th Cir.2006) (“Neither Salerno nor any other case authorizes detaining someone in jail while awaiting trial, or the imposition of special bail conditions, based merely on the fact of arrest for a particular crime. To the contrary, Salerno ... upheld the constitutionality of a bail system where pretrial defendants could be detained only if the need to detain them was demonstrated on an individualized basis.”). Lawmakers may rely on “reasonable presumptions and generic rules,” Demore, 538 U.S. at 526, 123, S.Ct. 1708; Flores, 507 U.S. at 313, 113 S.Ct. 1439, when a regulation “involves no deprivation of a ‘fundamental’ right,” Flores, 507 U.S. at 311,113 S.Ct. 1439, but “ ‘administrative convenience’ is a thoroughly inadequate basis for the deprivation of core constitutional rights,” id. at 346, 113 S.Ct. 1439 (Stevens, J., dissenting); see Stanley v. Illinois, 405 U.S. 645, 656-58, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). As the defendants conceded at oral argument, irrebuttable presumptions are disfavored.
*786 Thus, at minimum, to survive heightened scrutiny any such categorical rule, requiring pretrial detention in all cases without an individualized determination of flight risk or dangerousness, would have to be carefully limited. The state’s chosen classification would have to serve as a convincing proxy for unmanageable flight risk or dangerousness. It has generally been thought, for example, that capital offenses may be made categorically nonbailable because “most defendants facing a possible death penalty would likely flee regardless of what bail was set.” United States v. Kennedy, 618 F.2d 557, 558-59 (9th Cir. 1980) (per curiam).[8]
There is no evidence that undocumented status correlates closely with unmanageable flight risk. The defendants speculate that undocumented immigrants pose a greater flight risk than lawful residents because they supposedly lack strong ties to the community and have a “home” in another country to which they can flee. But this assumption ignores those undocumented immigrants who do have strong ties to their community or do not have a home abroad. As our own court’s immigration docket reveals, many undocumented immigrants were brought here as young children and have no contacts or roots in another country. Many have “children born in the United States” and “long ties to the community.” Arizona v. United States, — U.S. -, 132 S.Ct. 2492, 2499, 183 L.Ed.2d 351 (2012). A recent study of undocumented immigrants in California, published by the Center for the Study of Immigrant Integration at the University of Southern California, found that, “contrary to popular misperceptions,” undocumented immigrants are “a fairly settled population.” M. Pastor & E. Marcelli, What’s at Stake: Undocumented Californians, Immigration Reform, and Our Future Together 9 (May 2013), available at http://csii.usc.edu/undocumentedCA.html (last visited July 28, 2014). The researchers found that “nearly 50 percent of undocumented immigrants have been in the country for more than 10 years, and over 17 percent of household heads are homeowners.” Id.
Moreover, although the defendants consistently refer to undocumented immigrant arrestees as “flight risks,” the pertinent inquiry is whether the arrestee is an unmanageable flight risk. There are a variety of methods to manage flight risk, such as bond requirements, monitoring and reporting requirements. See, e.g., Ariz.Rev. *787 Stat. Ann. § 13-3967(D). Proposition 100 completely ignores these tools for managing flight risk, instead mandating incarceration in every case.
Before Proposition 100 passed, Arizona had an extensive bail scheme designed to help ensure that arrestees appear for trial. See Ariz. Const, art. 2, § 22(A)(3); Ariz. Rev.Stat. Ann. § 13-3967(B). These procedures already required judges to consider factors such as “[t]he accused’s family ties, employment, financial resources,” “length of residence in the community,” “[wjhether the accused has entered or remained in the United States illegally” and “[wjhether the accused’s residence is in this state, in another state or outside the United States.” Ariz.Rev.Stat. Ann. § 13-3967(B)(4), (8), (11)-(12). There is no evidence that this set of regulations, addressing flight risk on a case-by-case basis, was inadequate to protect the state’s compelling interest in ensuring undocumented immigrant arrestees’ appearance at trial. Cfi Demore, 538 U.S. at 520, 528, 123 S.Ct. 1708 (noting that Congress chose a mandatory detention rule only after evidence showed that individualized screening had failed to address the problem of convicted criminal detainees in large numbers failing to appear at their removal hearings). Furthermore, Arizona added the last two of these considerations — “[wjhether the accused has entered or remained in the United States illegally” and “[wjhether the accused’s residence is in this state, in another state or outside the United States,” Ariz.Rev.Stat. Ann. § 13 — 3967(B)(11)— (12) — only in June 2006, a few months before Proposition 100 was submitted to the state’s voters. See 2006 Ariz. Legis. Serv. Ch. 380 (H.B.2580) (West). Arizona gave these provisions no chance to succeed before resorting to mandatory detention in every case. Thus, although Judge Tail-man’s dissent asserts that individualized assessments of flight risk have been tried and failed (Dissent at 798, 803, 804), neither assertion is borne out by the record.
The Proposition 100 laws also do not reflect a “widely shared legislative judgment.” Scholl, 467 U.S. at 272, 104 S.Ct. 2403. The federal criminal justice system does not categorically deny bail to undocumented immigrant arrestees. See generally 18 U.S.C. § 3142; see id. § 3142(d).[9] Most states that categorically prohibit bail at all do so only for capital offenses[10] or for other very serious crimes.[11] Other *788 than Arizona, only Missouri singles out undocumented immigrants for the categorical denial of bail. See Mo. Ann. Stat. § 544.470(2).[12] The American Bar Association’s Standards for Criminal 'Justice do not make any offenses categorically non-bailable. They provide that “only defendants charged with dangerous or violent crimes or, in certain cases, with other serious crimes, may even be considered for detention,” and they state that “[a] decision to detain should be made only upon a clear showing of evidence that the defendant poses a danger to public safety or a risk of non-appearance that requires secure detention.” ABA Standards for Criminal Justice: Pretrial Release 35, 51 (3d ed.2007).
In an attempt to establish that the Proposition 100 laws satisfy due process, the defendants rely heavily on Demore v. Kim. This reliance is misplaced. Demore did uphold a categorical denial of bail without an individualized determination of flight risk or dangerousness for certain convicted criminal aliens briefly detained during their civil deportation proceedings. Demore, however, applied rational basis review, not heightened scrutiny, because it involved federal regulation of immigration. See Demore, 538 U.S. at 521-28, 123 S.Ct. 1708. Such regulations have to meet only “the (unexacting) standard of rationally advancing some legitimate governmental purpose,” Flores, 507 U.S. at 306, 113 S.Ct. 1439; see also Fiallo v. Bell, 430 U.S. 787, 793, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977); Mathews, 426 U.S. at 79-80, 96 S.Ct. 1883, not the heightened scrutiny required under Salerno. Demore, moreover, involved a class of detainees who had already been convicted of serious crimes, see 538 U.S. at 513,123 S.Ct. 1708, a “very limited” period of detention, id. at 529-30 & n. 12, 123 S.Ct. 1708, and extensive evidence and findings establishing the need for the policy, see id. at 513, 518-20, 528, 123 S.Ct. 1708.
In sum, we hold that the Proposition 100 laws do not satisfy the heightened substantive due process scrutiny Salerno requires. Although the state has a compelling interest in assuring that arrestees, including undocumented immigrants, appear for trial, Proposition 100 is not carefully limited to serve that interest.
*789 We further hold that the laws are facially unconstitutional. See Wash. State Grange, 552 U.S. at 449, 128 S.Ct. 1184. Because Proposition 100 is not “carefully limited” as Salerno’s heightened scrutiny test requires, “the entire statute fails [Sal-' emo’s ] decision rule and would thus be invalid in all of its applications.” Scott A. Keller & Misha Tseytlin, Applying Constitutional Decision Rules Versus Invalidating Statutes in Toto, 98 Va. L.Rev. 301, 331 (2012) (emphasis added). Even persons who could be detained consistent with due process under a different categorical statute, or who would be detained under Proposition 100 if it afforded an individualized determination, could successfully challenge the Proposition 100 laws on the same grounds relied on in our opinion, namely, failure to provide either a valid categorical exclusion from bail or an individualized determination. See Foucha, 504 U.S. at 80-83,112 S.Ct. 1780 (invalidating in toto a statute that categorically required commitment of all people found not guilty by reason of insanity as a violation of substantive due process (citing Salerno, 481 U.S. at 747-51, 755, 107 S.Ct. 2095)); Citizens United v. Fed. Election Comm’n, 558 U.S. 310, 376, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) (Roberts, C. J., concurring) (explaining that facial invalidation is appropriate when, “[g]iven the nature of th[e] claim and defense, ... any other [plaintiff] raising the same challenge would also win”); Keller & Tseytlin, supra, at 322 (“[E]very person has the right not to be subject to an unconstitutional law — that is, a law that violates a textual decision rule.”).[13] There exists, therefore, “ ‘no set of circumstances .... under which [the Proposition 100 laws] would be valid.’ ” Wash. State Grange, 552 U.S. at 449, 128 S.Ct. 1184 (quoting Salerno, 481 U.S. at 745,107 S.Ct. 2095).
Furthermore, the Proposition 100 laws have been fully implemented, so there is no possibility that Arizona or Maricopa County will implement them in a narrower, constitutional manner, cf. Wash. State Grange, 552 U.S. at 450, 128 S.Ct. 1184, and the defendants have not suggested any “reasonable” or “readily apparent” narrowing construction that would make the laws constitutional, Stenberg v. Carhart, 530 U.S. 914, 944, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000) (quoting Boos v. Barry, 485 U.S. 312, 330, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988)) (internal quotation marks omitted). Accordingly, the laws are facially unconstitutional.
2.
We next consider whether the Proposition 100 laws violate substantive due process by imposing punishment before trial. See Salerno, 481 U.S. at 746, 107 S.Ct. 2095. “To determine whether a restriction on liberty constitutes impermissible punishment or permissible regulation, we first look to legislative intent.” Id. at 747, 107 S.Ct. 2095. “Unless [the legislature] expressly intended to impose puni *790 tive restrictions, the punitive/regulatory distinction turns on whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it.” Id. (alterations and internal quotation marks omitted).
To discern legislative intent, the district court considered both (1) the legislative record before the Arizona legislature that passed and referred Proposition 100 to the voters and (2) statements made during the referendum drive and in election materials. The court concluded that the legislative record “suggests that Proposition 100 may have been motivated by a desire to punish for past crimes, but there is also evidence that legislators considered the issue of flight risk.” Similarly, the court concluded that the “voter materials" contained some official statements reflecting a punitive purpose, but ultimately the message was mixed.” And the court ultimately concluded that “the record as a whole does not support a finding that Proposition 100 was motivated by an improper punitive purpose.” Given the mixed nature of the evidence of legislative and voter intent, and the difficulty in attributing motives to the electorate, we see no reason to revisit those conclusions on appeal. By assuming without deciding that Proposition 100 does not have a punitive purpose, however, we do not minimize the considerable evidence of punitive intent found in this record.[14] There is strong evidence that Proposition 100 was motivated at least in significant part by a desire to punish undocumented immigrants for (1) entering and remaining in the country without authorization and (2) allegedly committing the charged offense.[15]
*791 Nevertheless, assuming that Proposition 100 was adopted for the permissible regulatory purpose of managing flight risk, “the punitive/regulatory distinction turns on whether” Proposition 100 “appears excessive in relation to the alternative purpose assigned to it.” Salerno, 481 U.S. at 747, 107 S.Ct. 2095 (alterations and internal quotation marks omitted). As discussed earlier, Salerno held that the Bail Reform Act was not excessive where it addressed a “pressing societal problem,” “carefully limit[ed] the circumstances under which detention may be sought to the most serious of crimes” and entitled the arrestee to “a prompt detention hearing” at which an individualized determination of dangerousness was required. Id. By contrast, Proposition 100 is excessive in relation to its stated legitimate purpose because it purports to deal with a societal ill — unmanageable flight risk posed by undocumented immigrants as a class — that has not been shown to exist. Even 'if we assume that a problem exists, Proposition 100 employs a profoundly overbroad irrebuttable presumption, rather than an individualized evaluation, to determine whether an arrestee is an unmanageable flight risk. As discussed, this mechanism necessarily results in the deprivation of liberty even where not necessary to ensure appearance at trial, because undocumented immigrants who do not pose a flight risk or who pose a manageable one are categorically denied bail based solely on their status. Given this severe lack of fit between the asserted nonpunitive purpose and the actual operation of the law, we conclude that Proposition 100’s bail provisions are punitive rather than regulatory. Thus, the Proposition 100 laws facially violate substantive due process by imposing punishment before trial.
IV.
To conclude, Proposition 100 categorically denies bail or other pretrial release and thus requires pretrial detention for every undocumented immigrant charged with any of a broad range of felonies, regardless of the seriousness of the offense or the individual circumstances of the arrestee, including the arrestee’s strong ties to and deep roots in the community. The defendants maintain that this unusual, sweeping pretrial detention statute, directed solely at undocumented immigrants, comports with substantive due process. It does not. The Supreme Court has made clear that “[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.” Salerno, 481 U.S. at 755, 107 S.Ct. 2095. The “narrowly foeuse[d]” pretrial release statute upheld in Salerno provided a “careful delineation of the circumstances under which detention will be permitted.” Id. at 750-51,107 S.Ct. 2095. In contrast, the Proposition 100 laws do not address an established “particularly acute problem,” are not limited to “a specific category of extremely serious offenses,” and do not afford the individualized determination of flight risk or dangerousness that Salerno deemed essential. Id. at 750, 107 S.Ct. 2095. These laws represent a “scattershot attempt” at addressing flight risk and are not narrowly tailored to serve a compelling interest. Id. In addition, and for the same *792 reasons, the challenged laws are excessive in relation to the state’s legitimate interest in assuring arrestees’ presence for trial. They therefore impermissibly impose punishment before an adjudication of guilt. For these reasons, we hold that the Proposition 100 laws violate the substantive component of the Due Process Clause of the Fourteenth Amendment on these two independent grounds. Because we hold that the laws facially violate substantive due process, we do not reach the plaintiffs’ procedural due process, Eighth Amendment, Sixth Amendment and preemption claims.[16] The judgment of the district court is reversed.
REVERSED AND REMANDED.

. The Arizona legislature passed the legislation and referred it to the voters in May 2005. The voters approved Proposition 100 in November 2006.

. Although we assume that the named plaintiffs are no longer in pretrial detention, no one has suggested that this case has become moot as a consequence. See Bates v. United Parcel Serv., Inc., 511 F.3d 974, 987 (9th Cir.2007) (en banc) (“With regard to mootness, the Supreme Court held that the 'cases or controversies’ requirement of Article III— which requires a plaintiff with a live case or controversy, not only at the time of filing and at the time of class certification, but also when a court reviews the case — is satisfied by *777 'a named defendant and a. member of the class represented by the named plaintiff, even though the claim of the named plaintiff has become moot.’ " (quoting Sosna v. Iowa, 419 U.S. 393, 402, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975))).

. At oral argument, the defendants conceded that Salerno applied heightened scrutiny and that heightened scrutiny applies here.

. See also Zadvydas, 533 U.S. at 718, 121 S.Ct. 2491 (Kennedy, J., dissenting) (“As persons within our jurisdiction, ... aliens are entitled to the protection of the Due Process Clause.”); cf. Shaughnessy v. United States ex rel.-Mezei, 345 U.S. 206, 212, 73 S.Ct. 625, 97 L.Ed. 956 (1953) ("[Ajliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law.”).

. "One 1986 study showed that, after criminal aliens were identified as deportable, 77% were arrested at least once more and 45%— nearly half — were arrested multiple times before their deportation proceedings even began.” Demore, 538 U.S. at 518, 123 S.Ct. 1708. Another study showed that "[o]nce released, more than 20% of deportable criminal aliens failed to appear for their removal hearings.” Id. at 519, 123 S.Ct. 1708. Congress also had empirical evidence that, "even with individualized screening, releasing deportable criminal aliens on bond would lead to an unacceptable rate of flight.” Id. at 520, 123 S.Ct. 1708; see also id. at 528, 123 S.Ct. 1708. Such evidence is lacking here.

. In arguing that Proposition 100 addressed a particularly acute problem, Judge Tallman focuses on two factors: (1) statements made in support of Proposition 100 by then-Maricopa County Attorney Andrew Thomas; and (2) that Arizona voters approved the Proposition by a wide margin. Neither argument is persuasive.
As part of the 2006 campaign in favor of Proposition 100, County Attorney Thomas asserted that “[f]ar too many illegal immigrants accused of serious crimes have jumped bail and slipped across the border in order to avoid justice in an Arizona courtroom.” He also told Lou Dobbs Tonight that Arizona had a "tremendous problem with illegal immigrants coming into the state, committing serious crimes, and then absconding, and not facing trial for their crimes, either because they jump bail after they are out, or because, when they are let out on bail, the federal government deports them.” The record does not substantiate Thomas' claims, however, and he is not a credible source. He was disbarred in 2012 for using his office to destroy political enemies, filing malicious and unfounded criminal charges, committing perjury and engaging in a host of other crimes, and the state bar committee found that he had “outrageously exploited power,” “flagrantly fostered fear,” "disgracefully misused the law” and “dishonored, desecrated, and defiled” the public trust. In re Thomas, No. PDJ-2011-9002 (Before the Presiding Disciplinary Judge of the Supreme Court of Arizona, Apr. 10, 2012) (Opinion and Order Imposing Sanctions), at p. 245, available at *784 http ://www. azcourts .gov/mediaroom/High ProfileCaseUpdate.aspx (last visited July 10, 2014). Although Judge Tallman relies heavily on Thomas’ comments (Dissent at 798-99, 801 & n. 4), the defendants tellingly do not even mention them.
That Arizona voters approved Proposition 100 by a large margin (Dissent at 798, 801 & n. 5, 801, 802) also does not show that the legislation addressed a particularly acute problem. At most, the vote shows that voters perceived a problem, not that one actually existed. Moreover, as discussed below in part III.B.2 and in Judge Nguyen's concurrence, there is substantial evidence that Arizona voters approved Proposition 100 at least in part for reasons other than a perceived problem of flight risk — to punish undocumented immigrants for perceived immigration and criminal violations.

. Proposition 100, for example, covers foreign citizens who have no legal right to return to their home countries. Conversely, Proposition 100 excludes from coverage individuals who would seem more likely to flee — such as foreign citizens who are in this country lawfully as tourists and persons having dual citizenship.

. We do not, as Judge Tallman writes, "effectively preclud[e] the use of irrebuttable presumptions in the bail context.” Dissent at 803. Rather, we conclude that whether a categorical denial of bail for noncapital offenses could ever withstand heightened scrutiny is an open question, and then assume without deciding that such a rule would be constitutional were it adequately tailored. Our conclusion that this is an open question is clearly correct, given that neither the Supreme Court nor any federal court of appeals has addressed the question. The closest case is Hunt v. Roth, 648 F.2d 1148 (8th Cir. 1981); vacated as moot sub nom. Murphy v. Hunt, 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982), where the Eighth Circuit held that a provision of the Nebraska Constitution categorically denying bail to persons charged with certain sexual offenses violated the Excessive Bail Clause of the Eighth Amendment because it employed an irrebuttable presumption rather than requiring an individualized determination of flight risk. In language that one might apply here as well, the Eighth Circuit held that "[t]he fatal flaw in the Nebraska constitutional amendment is that the state has created an irrebuttable presumption that every individual charged with this particular offense is incapable of assuring his appearance by conditioning it upon reasonable bail or is too dangerous to be granted release.” Hunt, 648 F.2d at 1164. Hunt, however, was later vacated as moot, so it remains the case that no federal appellate court has yet addressed in a precedential decision whether a categorical denial of bail comports with the Constitution.

. Pre-adjudication eligibility for bail is also the norm in federal removal proceedings. See 8 U.S.C. § 1226(a). Federal law mandates detention during removal proceedings only for "a limited class of deportable aliens — including those convicted of an aggravated felony.” Demore, 538 U.S. at 517-18, 123 S.Ct. 1708; see 8 U.S.C. § 1226(c).

. See Ala. Const, art. I, § 16; Alaska Const, art. I, § 11; Ark. Const, art. 2, § 8; Cal. Const, art. I, § 12; Colo. Const, art. II, § 19; Conn. Const, art. I, § 8; Del. Const, art. I, § 12; Idaho Const, art. I, § 6; Kan. Const. Bill of Rights § 9; Ky. Const. § 16; La. Const, art. I, § 18; Me. Const, art. I, § 10 (current or former capital offenses nonbailable); Minn. Const, art. I, § 7; Miss. Const, art. 3, § 29; NJ. Const, art. I, ¶ 11; N.D. Const, art. I, § 11; Ohio Const, art. I, § 9; Okla. Const, art. 2, § 8; Tenn. Const, art. I, § 15; Tex. Const, art. I, § 11; Wash. Const, art. I, § 20; Wyo. Const, art. 1, § 14.

.See Fla. Const, art. I, § 14 (capital offenses and offenses punishable by life imprisonment nonbailable); 111. Const, art. I, § 9 (capital offenses and offenses punishable by life imprisonment nonbailable); Ind. Const, art. 1, § 17 (murder and treason nonbailable); Md. Code Ann., Crim. Proc. § 5-202 (prohibiting pretrial release for an arrestee charged with escaping from a correctional facility); Mass. Gen. Laws ch. 276, § 20D (capital offenses and offenses punishable by life imprisonment nonbailable); Mich. Const, art. I, § 15 (murder, treason, repeat violent felonies and felonies committed while out on bail, probation *788 or parole for a prior violent felony nonbailable); Neb. Const, art. I, § 9 (murder, treason and serious sexual offenses nonbailable); Nev. Const, art. 1, § 7 (capital offenses or murders punishable by life imprisonment without possibility of parole nonbailable); N.H.Rev.Stat. Ann. § 597:l-c (offenses "punishable by up to life in prison” nonbailable); N.M. Const, art. II, § 13 (capital offenses and certain repeat felony offenders nonbailable); Or. Const, art. I, § 14 (murder and treason nonbailable); Pa. Const, art. I, § 14 (capital offenses or offenses punishable by life impris onment nonbailable); R.I. Const, art. I, § 9 (offenses punishable by life imprisonment, offenses involving dangerous weapons by arrestees previously convicted of other offenses and certain controlled substance offenses nonbailable); S.C. Const, art. I, § 15 (capital offenses, offenses punishable by life imprisonment and certain violent offenses nonbailable); Utah Const, art. I, § 8 (capital offenses and felony offenses committed while out on bail, probation or parole for prior felony offense nonbailable).

. Alabama formerly categorically denied bail to undocumented immigrants as well, see Ala. Code § 31-13-18(b), but the state has concluded that § 31 — 13—18(b) violates the Alabama Constitution, and the law is no longer in force. See Dismissal Order and Stipulated Permanent Injunction, Hispanic Interest Coal, of Alabama v. Bentley, No. 5:11-CV2484-SLB (N.D.Ala. Nov.' 25, 2013), at 2 n.4 ("The State Defendants further represent that in light of Article 1, Section 16, of the Alabama Constitution, they understand that Section 19(b) of H.B. 56 (Ala.Code § 31 — 13—18(b)) can only be applied to deny bail to persons arrested for a capital crime, and cannot be applied to deny bail to individuals arrested for or charged solely with non-capital crimes, regardless of their immigration status.”).

. Keller and Tseytlin explain that “the Su-' preme Court has created various constitutional decision rules to enforce the Constitution's provisions and constrain lower courts as they adjudicate constitutional disputes.” Keller & Tseytlin, supra, at 320. The authors identify "two broad categories of decision rules: textual decision rules and enforcement decision rules.” Id. at 322. Textual decision rules "require courts to examine the statutory text enacted by the legislature or the circumstances surrounding that text’s enactment.” IdL Enforcement decision rules, by contrast, "direct courts to examine the particular facts surrounding the executive’s or the judiciary’s enforcement of a statute instead of the statutory text itself.” Id. at 324. Salerno’s heightened scrutiny substantive due process test, which we apply here, is a textual decision rule, and application of such a rule will lead to in toto invalidation where, as here, "the ljtigants' arguments and the courts' inquiries focused on the entire statutory coverage.” Id. at 339.

. A partial summary of that evidence: State Representative Russell Pearce, the bill’s sponsor, stated that Proposition 100 "just simply bridges the gap, a loophole in the law that would allow people who are not in this country [] legally who have no business to be released if they commit any crime, they have no business being released if they commit no crime, no additional crime [be]cause they’re already in this country illegally.” Senate Judiciary Committee Meeting on H.B. 2389 and HCR 2028, 47th Leg., 1st Regular Sess. (Ariz. 2005). Said Pearce, ”[B]ad enough you’re illegal but you commit a serious crime you ought not to be bondable.” Id. He added: ”[T]his bill targets very simply those who commit serious, serious [criminal] acts in our community. A very responsible bill to protect our citizens from those who would enter our country illegally and commit serious crimes against us....” Id. Rep. Pearce promoted the bill on the ground that "all illegal aliens in this country ought to be detained, debriefed and deported.” Id. He reiterated: "If you’re in this country illegally you ought to be detained [and] deported[J [E]nd of story,” and he defended the bill as a "reasonable approach” to border security. Id. State Representative Ray Barnes expressly promoted the bill on the assumption that “the mere fact that they’re here undocumented [means] that the crime has already been committed.” House Judiciary Committee Meeting on H.B. 2389, 47th Leg., 1st Regular Sess. (Ariz.2005). State Senator Jack Harper said, "what part of illegal don’t we understand? Illegal aliens shouldn’t be able to get bond for anything.” Senate Judiciary Committee Meeting on H.B. 2389 and HCR 2028, 47th Leg., 1st Regular Sess. (Ariz.2005). In a hearing on a bill to implement Proposition 100 after its passage, State Representative John Kavanagh said: "I’m amazed that we provide bail to anybody who’s arrested for a crime that’s an illegal alien.... I therefore support this bill as a first step to what we should be really doing and that’s deporting anybody here illegally.” House Floor Meeting on S.B. 1265, 48th Leg., 1st Regular Sess. (Ariz.2007).

. Denying an arrestee bail for either of these reasons would be impermissible. Being present in the United States without authorization is not a crime, see Arizona v. United States, 132 S.Ct. at 2505 ("As a general rule, it is not a crime for a removable alien to remain present in the United States.”), and even if it were, only the federal government would be permitted to impose punishment for it, see id. at 2509 ("[I]t would disrupt the federal frame *791 work to put state officers in the position of holding aliens in custody for possible unlawful presence without federal direction and supervision.”). And bail could not be denied to punish arrestees for their charged, but unproven, crimes. See Bell, 441 U.S. at 535, 99 S.Ct. 1861 ("[Ujnder the Due Process Clause, a [defendant] may not be punished prior to an adjudication of guilt in accordance with due process of law.”); Salerno, 481 U.S. at 746, 107 S.Ct. 2095 (citing Bell for the proposition that pretrial detention violates substantive due process when it constitutes "impermissible punishment before trial”).

. We disagree with Judge O'Scannlain’s argument that the Proposition 100 laws must be evaluated under the Excessive Bail Clause of the Eighth Amendment rather than the substantive component of the Due Process Clause of the Fourteenth Amendment. Dissent at 805-07. The Supreme Court applied substantive due process review to bail-denial schemes in Salerno and Schall. Judge O’Scannlain would distinguish those cases on the ground that they involved the denial of bail for dangerousness rather than flight risk, but the Supreme Court has never recognized — or even suggested — that distinction. See, e.g., Zadvydas, 533 U.S. at 690, 121 S.Ct. 2491 (citing Salerno as setting out the general standard for detention in criminal cases); Foucha, 504 U.S. at 83, 112 S.Ct. 1780 (citing Salerno as setting out the general standard for the "pretrial detention of arrestees”). As Judge O’Scannlain recognizes, Dissent at 807, the parties also have not ”thorough[ly] brief[ed]” the Eighth Amendment issues. For these reasons, we properly rely on substantive due process rather than the Eighth Amendment to address Proposition 100’s constitutionality.