IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

JAMES FELIX MORRENO,
*Petitioner,*

*v.*

THE HONORABLE NICOLE BRICKNER, COMMISSIONER OF THE SUPERIOR
COURT OF THE STATE OF ARIZONA, IN AND FOR THE COUNTY OF MARICOPA,
*Respondent Commissioner,*

STATE OF ARIZONA EX REL. WILLIAM G. MONTGOMERY, MARICOPA
COUNTY ATTORNEY,
*Real Party in Interest.*

No. CV-17-0193-SA
Filed May 2, 2018

Special Action from the Superior Court in Maricopa County
The Honorable Nicole Brickner, Commissioner
No. CR 2016-107138
No. CR 2016-130854
**AFFIRMED**

Order of the Court of Appeals, Division One
No. 1 CA-SA 17-0143

COUNSEL:

James J. Haas, Maricopa County Public Defender, Brian Thredgold
(argued), Timothy Sparling, Rachel A. Golubovich, Deputy Public
Defenders, Phoenix, Attorneys for James Felix Morreno

William G. Montgomery, Maricopa County Attorney, Amanda M. Parker
(argued), Deputy County Attorney, Phoenix, Attorneys for State of Arizona

Mark Brnovich, Arizona Attorney General, Dominic E. Draye, Solicitor General, Rusty D. Crandell, Assistant Solicitor General, Phoenix, Attorneys for Arizona Attorney General

---

VICE CHIEF JUSTICE PELANDER authored the opinion of the Court, in which CHIEF JUSTICE BALES, and JUSTICES BRUTINEL, TIMMER, and BOLICK joined. JUSTICE GOULD, joined by JUSTICE LOPEZ, dissented in part and concurred in the result.

---

VICE CHIEF JUSTICE PELANDER, opinion of the Court:

¶1 Article 2, section 22(A)(2), of the Arizona Constitution ("the On-Release provision") precludes bail "[f]or felony offenses committed when the person charged is already admitted to bail on a separate felony charge and where the proof is evident or the presumption great as to the present charge." We hold that, on its face, the On-Release provision satisfies heightened scrutiny under the Fourteenth Amendment's Due Process Clause.

**I.**

¶2 James Morreno was indicted for possession of marijuana and possession of drug paraphernalia, both felonies, in March 2016. After his initial appearance in that case, Morreno was released on his own recognizance. As a condition of his release, Morreno was ordered to "refrain from committing any criminal offense."

¶3 In May, the police received reports of a suspicious person and contacted Morreno. He admitted possessing marijuana and a marijuana pipe and was again charged with felony possession of marijuana and possession of drug paraphernalia. His initial appearance in that case was scheduled for July, but Morreno failed to appear and an arrest warrant was issued.

¶4 Morreno was arrested in 2017 and held without bail pursuant to the On-Release provision. Relying on *Simpson v. Miller (Simpson II)*, 241 Ariz. 341 (2017), he moved to modify his release conditions and argued that the On-Release provision was facially invalid because it deprived him of a pre-detention individualized determination of future dangerousness to

which he was constitutionally entitled. The superior court disagreed and denied the motion.

**¶5** Morreno filed a petition for special action, which the court of appeals stayed pending this Court's decision on whether to grant review in a similar case. Thereafter, Morreno filed a petition for review in this Court challenging the superior court's ruling and the court of appeals' stay order.

**¶6** Although Morreno has since pleaded guilty to the charged offenses in both cases (rendering his constitutional challenge moot as applied to him), we granted review to address the facial constitutionality of the On-Release provision, a recurring issue of statewide importance. We have jurisdiction under article 6, section 5(3), of the Arizona Constitution.

## II.

**¶7** We review de novo the validity of the On-Release provision. *See Simpson II*, 241 Ariz. at 344 ¶ 7.

**¶8** In 1970, Arizona voters passed Proposition 100, and thereby amended the state constitution, adding among other things the On-Release provision. *See* Ariz. Const. art. 2, § 22(A)(2); *see also* Ariz. Sec'y of State, Referendum and Initiative Publicity Pamphlet 2–4 (1970), http://azmemory.azlibrary.gov/cdm/compoundobject/collection/statep ubs/id/10654. Under that provision, a defendant charged with a felony allegedly committed while "already admitted to bail on a separate felony charge" is ineligible for bail "where the proof is evident or the presumption great as to the [new] charge." Ariz. Const. art. 2, § 22(A)(2). A defendant like Morreno who was released on his own recognizance on a prior charge "has been 'admitted to bail' for purposes of [the On-Release provision]." *Heath v. Kiger*, 217 Ariz. 492, 493 ¶ 1 (2008).

**¶9** Throughout the briefing in this Court and below, Morreno framed his argument as a facial challenge to the On-Release provision. At oral argument in this Court, Morreno initially confirmed that position before contending that the provision is unconstitutional as applied to him. We consider only the facial challenge because Morreno's guilty plea renders

3

moot any as-applied challenge.[1]

### III.

¶10      Morreno's challenge to the On-Release provision requires us to revisit the delicate balance between "state interests of the highest order" and "the fundamental due process right to be free from bodily restraint." *Simpson II*, 241 Ariz. at 345 ¶ 9.

¶11      Our court of appeals has upheld and applied the On-Release provision against constitutional attack. *See State ex rel. Romley v. Superior Court*, 185 Ariz. 160, 164 (App. 1996) (ordering the defendant "to be held without bond pending trial" when proof was evident and presumption great that he committed a felony while released on bail on prior charge); *State v. Garrett*, 16 Ariz. App. 427, 429 (1972) (same, and finding the On-Release provision's purpose and policy "entirely reasonable"). Morreno argues that those cases do not survive *Simpson II* and that the On-Release provision "deprives defendants of due process because it fails to comport with" our opinion in that case. Under *Simpson II*, he contends, bail "cannot be denied without a showing of [future] dangerousness following an individualized adversarial hearing" under A.R.S. § 13-3961(D), and not before considering various factors such as those set forth in A.R.S. § 13-3967(B). The State, in contrast, argues that the On-Release provision is constitutional under *Simpson II* because it is "not offense-based," but is instead "status-based" and narrowly focused on "recidivistic tendencies."

¶12      Before evaluating these arguments, we first address the Attorney General's assertion that "*Simpson II* was incorrect" and should be overruled "to the extent that it misapplies the facial challenge and substantive due process tests from *United States v. Salerno*, 481 U.S. 739 (1987)." Echoing an argument we rejected in *Simpson II*, the Attorney General contends that this Court misapplied the standard for evaluating facial challenges and erroneously pronounced a "heightened scrutiny standard for due process challenges to bail restrictions." Justice Gould's

---

[1] We similarly do not address Morreno's contention that the On-Release provision conflicts with Proposition 200, adopted by Arizona voters in 1996 and codified in A.R.S. § 13-901.01, which requires probation in limited circumstances for those convicted of certain crimes involving the possession or use of marijuana or drug paraphernalia.

partial dissent mirrors those contentions, with which we disagree.

**¶13**　　　In *Simpson II*, we applied a "heightened scrutiny" standard derived from *Salerno* to hold that the Fourteenth Amendment's Due Process Clause prohibits the state from automatically denying bail to all defendants charged with sexual conduct with a minor under age fifteen. *Simpson II*, 241 Ariz. at 344 ¶ 1, 348 ¶ 23. In so holding, this Court invalidated the no-bail provisions in article 2, section 22(A)(1), of the Arizona Constitution and A.R.S. § 13-3961(A)(3) as they related to that charged offense, and we rejected the State's argument that "the challenged provisions [were not] unconstitutional on their face because they may not be unconstitutional in all instances." *Simpson II*, 241 Ariz. at 349 ¶ 31.

**¶14**　　　In *Simpson II*, we recognized that a party challenging a law as facially unconstitutional "must establish that it 'is unconstitutional in all of its applications.'" 241 Ariz. at 344–45 ¶ 7 (quoting *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2451 (2015)); *see also Salerno*, 481 U.S. at 745 (stating that a successful facial challenge requires "the challenger [to] establish that no set of circumstances exists under which the [law] would be valid"). We also recognized that in some instances the commission of sexual conduct with a minor "may indicate a threat of future dangerousness toward the victim or others." *Simpson II*, 241 Ariz. at 349 ¶ 31. That was not determinative, however, because the offense of sexual conduct with a minor "is not inherently predictive of future dangerousness," and therefore "detention [in those cases] requires a case-specific inquiry." *Id.*

**¶15**　　　*Simpson II* does not contradict *Salerno* or the other cases on which the Attorney General and Justice Gould's dissent rely. *Salerno* rejected a facial challenge to the 1984 Bail Reform Act because of its "extensive safeguards," which required not only a showing of probable cause for the charged offense, but also a showing "by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person." 481 U.S. at 750, 752 (citing 18 U.S.C. § 3142(f)). The provisions at issue in *Simpson II*, in contrast, lacked any such safeguards and by their terms categorically denied bail to all defendants charged with sexual conduct with a minor under age fifteen — a crime that does not inherently predict future dangerousness. 241 Ariz. at 349 ¶ 27. Thus, a facial challenge succeeded because the no-bail provisions deprived such defendants of what substantive due process requires: an individualized determination of, or a valid proxy for, future dangerousness. *Id.* ¶ 30.

¶16  That some defendants who are charged with sexual conduct with a minor may properly be denied bail when other facts are present (i.e., evidence of future dangerousness or flight risk) does not defeat a facial challenge. *See id.* ¶ 31 (noting that in arguing against a facial challenge, the State "confus[ed] the constitutionality of detention in specific cases with the requirement that it be imposed in all cases"). The facial challenge was to the denial of bail based merely on the charge without considering other facts that may — or may not — justify denying a defendant bail in a particular case.

¶17  *Patel* illustrates this point well. There, the government — much like the State here — argued that a statute should not be subject to a facial challenge because in some circumstances the conduct it authorized would be constitutionally permissible (there, a search of hotel guest records; here, pretrial detention). *Patel*, 135 S. Ct. at 2450–51. The United States Supreme Court rejected that argument, noting that "the proper focus of the constitutional inquiry is searches that the law actually authorizes, not those for which it is irrelevant." *Id.* at 2451.

¶18  Based on due process principles, the Court likewise has invalidated other laws that categorically denied important, protected interests without regard to individual circumstances. In *Stanley v. Illinois*, for example, the Court struck a state law under which "the children of unwed fathers became wards of the State upon the death of the mother." 405 U.S. 645, 646 (1972). Rejecting the law's "blanket exclusion" that "viewed people one-dimensionally," the Court concluded that, "as a matter of due process of law, [the father] was entitled to a hearing on his fitness as a parent before his children were taken from him." *Id.* at 649, 655. And though recognizing the possibility that "most unmarried fathers are unsuitable and neglectful parents" and that Mr. Stanley was "such a parent and that his children should be placed in other hands," the Court nonetheless noted that "all unmarried fathers are not in this category; some are wholly suited to have custody of their children." *Id.* at 654. Accordingly, the law could not stand because it "needlessly risk[ed] running roughshod over the important interests of both parent and child." *Id.* at 657; *cf. Foucha v. Louisiana*, 504 U.S. 71, 81–83 (1992) (distinguishing *Salerno* and finding unconstitutional a state statute under which a defendant found not guilty by reason of insanity was committed indefinitely to a psychiatric hospital unless he proved that he was not dangerous).

¶19 Here, that some defendants may properly be held without bail when they commit an offense while "on-release" — for example, pursuant to article 2, section 22(A)(3) — does not mean (as the Attorney General suggests) that the On-Release provision necessarily survives a facial challenge. We therefore decline his invitation to overrule or limit *Simpson II*.

¶20 Justice Gould's partial dissent is unpersuasive for several reasons. It selectively relies on portions of *Salerno* in describing the standard for finding a law facially unconstitutional but disregards key features of the Bail Reform Act that, as discussed, *see supra* ¶ 15, were critical to *Salerno*'s analysis and conclusion. *See also United States v. Stephens*, 594 F.3d 1033, 1038 (8th Cir. 2010) (noting that *Salerno* "lauded the Bail Reform Act's procedures"). As *Salerno* observed, the Bail Reform Act required individualized hearings in which "the Government [had to] convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person." 481 U.S. at 750. The dissent overlooks the *Salerno* Court's analytical emphasis that the Act contained those important "procedural protections" and "narrowly focuse[d] on a particularly acute problem," *id.* at 750–52, features that were critical to its holding, *id.* at 751. It was only those "narrow circumstances" and the Act's "extensive [procedural] safeguards" that "suffice[d] to repel a facial challenge." *Id.* at 752. Nothing in *Salerno* suggests that the Court would have upheld the Act against a facial challenge even absent those safeguards, all of which were lacking in *Simpson II*. *See supra* ¶ 15.

¶21 The dissent's failure to recognize these key aspects of *Salerno*, in turn, causes it to incorrectly assert that *Simpson II* deviated from *Salerno* and to mischaracterize *Simpson II* as applying an "overbreadth analysis." *See infra* ¶¶ 39, 48. The provisions at issue in *Simpson II* were facially invalid because they did not — indeed, could not — afford any defendant what due process requires: an individualized hearing or a convincing proxy for future dangerousness. The mere charge itself was not a convincing proxy for future dangerousness, and therefore not narrowly focused, because it swept in situations that are not predictive of future dangerousness. *Simpson II*, 241 Ariz. at 349 ¶ 27; *see also Salerno*, 481 U.S. at 750 (noting that the Bail Reform Act required "convincing proof that the arrestee, *already indicted or held to answer for a serious crime*, presents a demonstrable danger to the community" (emphasis added)). Thus, *Simpson II* did not misapply the

*Salerno* facial standard but instead comports with *Salerno*'s analysis. *See United States v. Scott*, 450 F.3d 863, 874 (9th Cir. 2006) ("Neither *Salerno* nor any other case authorizes detaining someone in jail while awaiting trial, or the imposition of special bail conditions, based merely on the fact of arrest for a particular crime.").

¶22    The dissent seemingly equates every facial challenge with an overbreadth challenge, which misapprehends those distinct doctrines. In essence, the dissent's quarrel with *Simpson II* is not with its application of *Salerno*'s standard for facial unconstitutionality, but with its application of *Salerno*'s "narrow focus" standard. *Simpson II*'s application of that standard is consistent with *Salerno*'s ultimate holding: "When the Government proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community, we believe that, consistent with the Due Process Clause, a court may disable the arrestee from executing that threat." *Salerno*, 481 U.S. at 751. Again, the Bail Reform Act in *Salerno* had numerous narrowing features that the provisions in *Simpson II* lacked. Key among these are a "careful delineation of the circumstances under which detention will be permitted" and "convincing proof that the arrestee . . . presents a demonstrable danger to the community." *Salerno*, 481 U.S. at 750–51.

¶23    Here, Morreno's facial challenge under *Salerno* is based on his argument that it is never constitutionally permissible to detain a person without bail based merely on proof evident or presumption great that the person committed a felony while "on-release" from another felony charge. Although we ultimately reject that argument for the reasons stated below, it still is properly considered a facial challenge. Under *Patel*, which the dissent does not convincingly address, the facial challenge is not barred by the fact that a person might be legally detained for reasons in addition to those required by the On-Release provision. *See State v. Ryce*, 368 P.3d 342, 354 (Kan. 2016) ("*Patel* emphasizes that the scope of circumstances we examine is determined and limited by the application of the statute—we do not consider the entire universe of possible scenarios, we must instead look to the circumstances actually affected by the challenged statute."). To be sure, the dissent's arguments here echo Justice Alito's dissent in *Patel*, but the *Patel* majority rejected Justice Alito's approach, and we likewise reject the dissent's mistaken view of *Simpson II*.

## IV.

**¶24** The Due Process Clause places significant limitations on the state's ability to detain a defendant charged with violating the law. *See Simpson II*, 241 Ariz. at 346 ¶ 13. In *Simpson II*, we explained that to meet constitutional standards, a pretrial detention scheme "may be used only for regulatory rather than punitive purposes" and must satisfy the rigors of "heightened scrutiny" under the Due Process Clause, requiring that the scheme be "narrowly focused on accomplishing the government's objective." *Id.* at 346 ¶ 13, 348 ¶¶ 23, 25. The On-Release provision meets these demands.

### A.

**¶25** We look to legislative intent (or here the intent of Arizona voters) to determine whether a pretrial detention scheme is punitive or regulatory. *Id.* at 347 ¶ 20. The 1970 publicity pamphlet for Proposition 100 indicates that the purpose of the proposed amendment was to address the "rapidly increasing crime rate in Arizona" caused by "repeat offenders . . . who continue their lives of crime while out on bail, awaiting trial." Ariz. Sec'y of State, Referendum and Initiative Publicity Pamphlet 3 (1970), http://azmemory.azlibrary.gov/cdm/compoundobject/collection/statep ubs/id/10654; *see also Heath*, 217 Ariz. at 496 ¶ 14 (recognizing Proposition 100's "purpose is to prevent those charged with felonies but released pending trial from committing additional crimes").

**¶26** There is no indication that the number of people denied bail under the On-Release provision is excessive in relation to that goal. Indeed, the provision applies only when strong evidence (more than probable cause) exists that a defendant committed another felony while on release from a prior felony charge. *See Simpson v. Owens (Simpson I)*, 207 Ariz. 261, 274 ¶ 40 (App. 2004); *see also Simpson II*, 241 Ariz. at 346 ¶ 16. We therefore conclude, and Morreno does not specifically contest, that the On-Release provision is regulatory. *See Simpson II*, 241 Ariz. at 347 ¶ 20, 348 ¶ 24 (concluding that the challenged provisions "are regulatory, not punitive, and therefore do not constitute a per se due process violation" when "[a]ll ballot arguments supporting Proposition 103 focused on protecting public safety by preventing additional crimes," and noting that those state interests are "'both legitimate and compelling'" (quoting *Salerno*, 481 U.S. at 749)).

**B.**

**¶27**        "Heightened scrutiny" under the Due Process Clause ensures that, absent "special circumstances," the government does not "restrain individuals' liberty prior to . . . criminal trial and conviction." *Salerno*, 481 U.S. at 749.  To satisfy heightened scrutiny's rigors, the state's interest in enforcing a pretrial detention scheme must be "legitimate and compelling," and the scheme must be "narrowly focuse[d] on a particularly acute problem." *Simpson II*, 241 Ariz. at 348 ¶ 23 (alteration in original) (internal quotation marks omitted) (quoting *Salerno*, 481 U.S. at 749–50).

**¶28**        Morreno contends that *Simpson II* controls here, such that "[a]rticle 2, § 22(A)(2) is unconstitutional under the Due Process Clause" because "the State cannot hold [him] in custody without bond unless it first demonstrates [his] future dangerousness."  In his view, the On-Release provision is a "hard-line," categorical denial of bail that fails to provide what due process requires: a pre-detention adversarial hearing of the type provided for in A.R.S. §§ 13-3961(D) and 13-3967(B).

**¶29**        We disagree.  Although *Simpson II* guides our analysis, it is not dispositive of the very different provision at issue here and does not require an individualized determination of dangerousness in every case to comply with due process principles.  *See* 241 Ariz. at 348 ¶ 26 ("[W]e do not read *Salerno* or other decisions to require . . . individualized determinations in every case.").  And despite Morreno's attempt to liken the On-Release provision to the constitutional and statutory provisions at issue in *Simpson II*, there are important differences.  Unlike the sexual-conduct-with-a-minor provisions involved in *Simpson II*, the On-Release provision does not categorically deny bail to all defendants accused of committing enumerated crimes.  Thus, unlike *Simpson II*, the issue here is not whether a particular charged offense is "in itself a proxy for dangerousness," *id.* at 349 ¶ 27, or for unmanageable flight risk, *id.* at 346 ¶ 17.  Rather, the issues are twofold: whether the state has a "legitimate and compelling" interest in preventing defendants from committing new felonies while on pretrial release from another felony charge, and whether denying bail to such a defendant (when the proof is evident or the presumption great he or she committed a new felony while on release from another felony charge) is "narrowly focuse[d]" on pursuing that goal.  *Id.* at 348 ¶ 23 (quoting *Salerno*, 481 U.S. at 749–50).

**¶30**        "The government's interest in preventing crime by arrestees is both legitimate and compelling."  *Salerno*, 481 U.S. at 749; *accord Schall v.*

*Martin*, 467 U.S. 253, 264 (1984) (rejecting due process challenge to statute that permitted pretrial detention of any juvenile arrested on any charge after a showing that the person might commit some undefined future crimes). The On-Release provision implicates that interest. Likewise, the state unquestionably has a legitimate and compelling interest in preventing defendants from committing new crimes while on pretrial release from prior criminal charges. *See Rummel v. Estelle*, 445 U.S. 263, 276 (1980) (providing that states have a legitimate interest "in dealing in a harsher manner with those who by repeated criminal acts have shown that they are simply incapable of conforming to the norms of society as established by its criminal law"). Committing a felony while on release, especially when a term of release requires crime-free conduct, evidences repeated lawlessness that society need not tolerate. And although the On-Release provision applies before any finding of guilt or conviction, its required showing of "proof evident" or "presumption great" for the "present charge[d]" offense committed while on release convincingly suggests recidivist tendencies. Ariz. Const. art. 2, § 22(A)(2).

¶31 The primary issue here, then, is whether the On-Release provision is "narrowly focused on accomplishing the government's objective" of preventing defendants from committing new felonies while on pretrial release from a prior felony charge. *Simpson II*, 241 Ariz. at 348 ¶ 25. The On-Release provision has two important features that limit its scope. By its terms, the provision does not deny bail to all criminal defendants alleged to have committed any crime while on pretrial release, but to a smaller subset who are charged with felonies committed while on release from a prior felony charge. And importantly, the provision applies only where the "proof is evident or the presumption great," Ariz. Const. art. 2, § 22(A)(2), a "robust" standard that requires an evidentiary hearing, *Simpson II*, 241 Ariz. at 346 ¶ 16, as to the defendant's guilt of the felony he allegedly committed while on pretrial release, *see Simpson I*, 207 Ariz. at 274 ¶ 40 (discussing the proof evident/presumption great standard). These features together help ensure that the provision's reach does not extend beyond the government's legitimate and compelling interest in preventing arrestees from committing additional felonies while on release from prior felony charges.

¶32 Morreno contends that the On-Release provision is not narrowly focused because some felonies, including the drug offenses with which he was charged, are neither inherently dangerous nor predictive of

future dangerousness. But he incorrectly presumes that the only state interest that could justify pretrial detention of "on release" offenders is future dangerousness. *Salerno* recognizes that a state has a compelling interest in preventing crime (not just dangerous crime) by arrestees, and that interest is even stronger when there is proof evident that the defendant violated the conditions of his first release by committing the second charged offense. The defendant's liberty interest, conversely, is reduced because it was already restricted by his arrest and release under conditions for the first charge. Under those circumstances, "the government's interest is sufficiently weighty," such that the defendant's right to be free from physical restraint is "subordinated to the greater needs of society." *Salerno*, 481 U.S. at 750–51.

¶33 Conditioning pretrial release on a defendant refraining from committing new crimes while on pretrial release from prior criminal charges is neither a new nor remarkable concept. *Rendel v. Mummert*, 106 Ariz. 233, 238–39 (1970) ("Pretrial release with restrictions placed upon a defendant's actions has long represented a compromise between the liberties that a person normally enjoys and the right of the state to insure compliance with its processes."); *see also* A.R.S. § 13-3967(C) (permitting the revocation of release "[o]n a showing of probable cause that the defendant committed *any offense* during the period of release" from a prior felony charge (emphasis added)). Moreover, the possibility of having pretrial release revoked for a subsequent felony is entirely consistent with the government's interest in preventing further crimes and avoiding recidivism, "assur[ing] compliance with its laws[,] and preserv[ing] the integrity of the judicial process by exacting obedience with its lawful orders." *Paquette v. Commonwealth*, 795 N.E.2d 521, 530 (Mass. 2003); *see also id.* at 529 (stating that, aside from "any inquiry into dangerousness, a court has inherent power to revoke a defendant's bail for breach of *any* condition of release" (emphasis added)).

¶34 We acknowledge the "variety of state procedures for implementing otherwise valid recidivism [laws]." *Parke v. Raley*, 506 U.S. 20, 27 (1992). Although the On-Release provision's approach apparently is not widely applied, Arizona is not alone in denying bail to defendants charged with additional, on-release felonies. *See, e.g.*, Tex. Const. art I, § 11a(a)(2) (denying bail to defendants "accused of a felony less than capital . . . committed while on bail for a prior felony for which he has been indicted"); Utah Const. art. I, § 8(1)(b) (denying bail to "persons charged

with a felony . . . while free on bail awaiting trial on a previous felony charge"); Iowa Code § 811.1(1) (denying bail to "defendant[s] awaiting judgment of conviction" who commit "a second or subsequent offense" of various felonies, including those involving marijuana possession); *State v. Burgins*, 464 S.W.3d 298, 301 (Tenn. 2015) ("A defendant may forfeit her right to bail by subsequent criminal conduct."); *cf. Parke*, 506 U.S. at 26 ("[Recidivism] laws currently are in effect in all 50 States, and several have been enacted by the Federal Government, as well." (internal citations omitted)). Regardless, what matters is that due process does not require an individualized hearing to reaffirm a defendant's recidivism risk when the state has met its burden of showing proof evident or presumption great that he engaged in recidivist behavior while on release. In such cases, an individualized determination serves no narrowing function and is therefore unnecessary.

**¶35** In enacting the On-Release provision, Arizona voters left "the keys to continued freedom" in the hands of felony defendants who enjoy pretrial release.[2] *Rendel*, 106 Ariz. at 238. Yet, even before the Arizona voters adopted the On-Release provision in 1970, Arizona statutes conditioned release on an arrestee's "good behavior" and cautioned that release could be revoked based on probable cause to believe the arrestee committed a felony while on release. *See* 1969 Ariz. Sess. Laws, ch. 129, § 5. In any case, we fail to understand how a defendant could complain "that his constitutional right to liberty has been violated when . . . the deprivation thereof was an inevitable consequence of his alleged failure to conform his conduct to the law[] . . . and to the explicit condition of his earlier release." *Paquette*, 795 N.E.2d at 530. Indeed, if a defendant "actively avoids all intended associations with the criminal elements of our society," or here avoids knowingly possessing illegal drugs or paraphernalia, "he will be able to avoid situations that could result in the revocation of his bail." *Rendel*, 106 Ariz. at 238.

## V.

**¶36** We briefly address and reject Morreno's suggestion that denying bail to recidivist felons is absurd in light of *Simpson II* and *Chantry*

---

[2] As of April 2, 2018, the Arizona Rules of Criminal Procedure have been amended to incorporate the On-Release provision into a defendant's initial appearance. Order Amending Rules 4.2, 5.1, 5.4, 7.2, and 7.4, Rules of Criminal Procedure, No. R-17-0015 (Ariz. 2017).

*v. Astrowsky*, 242 Ariz. 355 (App. 2017). According to Morreno, upholding the On-Release provision "effectively rule[s] that a person charged with possession of marijuana is inherently more dangerous than a person charged with having sex with a minor or molesting a child." Again, the On-Release provision is concerned not with future dangerousness but rather with preventing additional felonies by defendants while on release from a prior felony charge, and the provision is narrowly focused on that legitimate and compelling governmental interest. Morreno ignores a critical component of *Simpson II* and *Chantry* and again overlooks the substantial differences between the provisions at issue in *Simpson II* and the On-Release provision here. In short, while on release Morreno continued to engage in conduct that implicated him in new crimes despite specific warnings to refrain from any illegal conduct while on pretrial release. This conduct placed him squarely within the government's interest in preventing future crime by arrestees. *See Rummel*, 445 U.S. at 284 (stating that recidivism laws "segregate . . . from the rest of society" "one who repeatedly commits criminal offenses serious enough to be punished as felonies"). This is a far cry from *Simpson II* and *Chantry*, where the defendants' charges were not inherently predictive of future conduct. *See Simpson II*, 241 Ariz. at 349 ¶ 27; *accord Chantry*, 242 Ariz. at 355 ¶ 3.

**¶37** Finally, although our conclusion that the On-Release provision meets constitutional standards is neither based nor dependent on state statutes or rules, it comports with Arizona's pretrial release scheme. Under Arizona law, "[u]pon a finding of probable cause that the defendant committed a felony [while on] release, the defendant's release may be revoked." A.R.S. § 13-3968(B); *see also* Ariz. R. Crim. P. 7.5(d)(2) (authorizing courts to revoke pretrial release when "there is probable cause to believe a person committed a felony during the period of release").[3] It is well-established that this release condition passes substantive due process muster, *see Rendel*, 106 Ariz. at 238–39; *Burgins*, 464 S.W.3d at 306, and is a "necessary step to ensure compliance with our legal system and preserve its integrity," *Paquette*, 795 N.E.2d at 530. In other words, the state may constitutionally revoke release when a defendant violates a release condition, even though such revocation directly implicates the defendant's

---

[3] The 2018 amendments to the Arizona Rules of Criminal Procedure, which took effect January 1, 2018, did not materially alter Rule 7.5(d)(2). *See* Order Amending the Arizona Rules of Criminal Procedure, No. R-17-0002 (Ariz. 2017).

due process right to be free from unwarranted pretrial restraint. That the state may constitutionally deny bail for a subsequent felony charge under these circumstances, as the On-Release provision requires, is entirely consistent with that principle.

## VI.

¶38      For the reasons stated above, we uphold the constitutionality of article 2, section 22(A)(2), of the Arizona Constitution and affirm the superior court's order denying Morreno bail.

MORRENO v. HON. BRICKNER/STATE
JUSTICE GOULD, joined by JUSTICE LOPEZ, Dissenting in Part and
Concurring in the Result

JUSTICE GOULD, joined by JUSTICE LOPEZ, dissenting in part and concurring in the result.

¶39 I concur in the majority's decision denying Morreno's facial challenge to Arizona's On-Release provision. *See* Ariz. Const. art. 2, § 22(A)(2). However, I respectfully dissent from the majority's use of the overbreadth analysis contained in *Simpson II* to reach this result.

## I.

¶40 The standard for facially challenging the constitutionality of a statute is set forth in *United States v. Salerno*, 481 U.S. 739, 745 (1987):

> A facial challenge to a legislative [a]ct is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [a]ct would be valid. The fact that the [act] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment.

¶41 This standard was in place before *Salerno* and has been affirmed on many occasions. *See City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2451 (2015) ("Under the most exacting standard the Court has prescribed for facial challenges, a plaintiff must establish that a law is unconstitutional in all of its applications." (citation and internal quotation marks omitted)); *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) ("[A] plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' i.e., that the law is unconstitutional in all of its applications." (quoting *Salerno*, 481 U.S. at 745)); *Reno v. Flores*, 507 U.S. 292, 301 (1993) (noting that to prevail on a facial challenge, a party must show there are no set of circumstances under which the regulation would be valid); *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 796 (1984) (stating that a statute is invalid on its face if "it is unconstitutional in every conceivable application"); *see also City of Chicago v. Morales*, 527 U.S. 41, 78–80 (1999) (Scalia, J., dissenting) (discussing cases pre-*Salerno* applying the facial challenge standard).

MORRENO v. HON. BRICKNER/STATE
JUSTICE GOULD, joined by JUSTICE LOPEZ, Dissenting in Part and
Concurring in the Result

**¶42**        Under *Salerno*, facial challenges based on the overbreadth of a statute are limited to the First Amendment context.[4]  *Salerno*, 481 U.S. at 745; *see also United States v. Stevens*, 559 U.S. 460, 473 (2010) (stating that "[i]n the First Amendment context, however, this Court recognizes a second type of facial challenge, whereby a law may be invalidated as overbroad" (internal quotation marks omitted)); *Vincent*, 466 U.S. at 801 ("[T]here must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds.").  The reason for permitting First Amendment overbreadth challenges was clearly stated by the United States Supreme Court in *Broadrick v. Oklahoma*, 413 U.S. 601, 611-12 (1973):

> It has long been recognized that the First Amendment needs breathing space and that statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn . . . .  Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.

**¶43**        Outside the First Amendment context, there are a number of reasons for strictly limiting facial challenges.  One reason is that "constitutional rights are personal and may not be asserted vicariously." *Broadrick*, 413 U.S. at 610.  However, when a person facially attacks a statute, he seeks to strike down a statute that is constitutionally applied to him but "may conceivably be applied unconstitutionally to others."  *Id.*  In addition, "facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wash. State Grange*, 552 U.S. at 451.

---

[4] Facial overbreadth challenges have also been recognized in the context of abortion statutes.  *Sabri v. United States*, 541 U.S. 600, 609–10 (2004) (stating that facial challenges based on overbreadth are recognized in "relatively few settings," including free speech and abortion).

MORRENO v. HON. BRICKNER/STATE
JUSTICE GOULD, joined by JUSTICE LOPEZ, Dissenting in Part and
Concurring in the Result

¶44　　　　Limiting facial challenges is also based on the principle that courts must be careful in striking down statutes with respect to parties and factual applications that are not before it. *Id.* at 449–50; *Broadrick*, 413 U.S. at 610–11. Facial challenges alleging overbreadth not only "invite judgments on fact-poor records," but they "allow a determination that the law would be unconstitutionally applied to different parties and different circumstances" that are not before the court. *Sabri*, 541 U.S. at 609. At bottom, courts must exercise judicial restraint under such circumstances, recognizing that "under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws." *Broadrick*, 413 U.S. at 610–11.

## II.

¶45　　　　While the majority, in reliance on *Simpson II*, purports to apply *Salerno*'s standard, in practice it does not. *See supra* ¶ 14; *Simpson II*, 241 Ariz. at 344–45 ¶ 7 (stating a facial challenge requires "the party challenging the law [to] establish that it 'is unconstitutional in all of its applications'") (quoting *Patel*, 135 S. Ct. at 2451). Rather, it abandons the facial standard set forth in *Salerno*, substituting the overbreadth standard used in *Simpson II* and by the Ninth Circuit in *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772 (9th Cir. 2014).

## A.

¶46　　　　In *Simpson II*, defendants asserted that article 2, section 22(A)(1), of the Arizona Constitution (and its corresponding provision in A.R.S. § 13-3961(A)(3)) was facially invalid. *Simpson II*, 241 Ariz. at 344 ¶ 5. The constitutional provision at issue stated that a defendant was ineligible for bail or pretrial release if (1) he was charged with committing the crime of sexual conduct with a minor under the age of fifteen, and, (2) after an evidentiary hearing, the court determined the proof was evident or the presumption great that the defendant committed this crime. *Id.* at ¶ 2.

¶47　　　　Applying the "heightened scrutiny" test used by the Ninth Circuit in *Lopez-Valenzuela*, *Simpson II* sustained the defendants' facial challenge on the grounds the subject provision violated substantive due process. *Id.* at 346, 348, 349 ¶¶ 17, 23, 30; *see also Lopez-Valenzuela*, 770 F.3d at 780 (discussing the application of a "heightened scrutiny" standard to a pretrial detention statute). *Simpson II* recognized that the purpose of the

MORRENO v. HON. BRICKNER/STATE
JUSTICE GOULD, joined by JUSTICE LOPEZ, Dissenting in Part and
Concurring in the Result

bond provision, protecting children from potentially dangerous sex offenders, was both legitimate and compelling. *Id*. at 348 ¶ 24. However, the Court determined that the provision was not "narrowly focused" to achieve this purpose. *Id*. at 348–49 ¶¶ 25–28. In reaching this conclusion, *Simpson II* held that the offense-based bond provision did not allow a court to make an "individualized determination" as to a defendant's dangerousness. *Id*. ¶¶ 25–26. The Court held that absent such an individualized hearing, any offense-based approach must be premised on crimes that "inherently predict future dangerousness," *id*. at 349 ¶ 30, and therefore serve as a "convincing proxy for unmanageable flight risk or dangerousness," *id*. at 348–49 ¶¶ 26–27 (quoting *Lopez-Valenzuela*, 770 F.3d at 786).

¶48 Ultimately, *Simpson II* concluded that the bond provision, on its face, violated due process because sexual conduct with a minor is not a "convincing proxy for . . . dangerousness." *Id*. at 348-49 ¶¶ 26-27. What is remarkable about this conclusion is that in reaching it, the Court abandoned *Salerno* and employed an overbreadth analysis. On the one hand, the Court recognized that there were circumstances where the provision would be valid. The Court stated that "[s]exual conduct with a minor is always a serious crime," and "[i]n *many but not all instances*, its commission may indicate a threat of future dangerousness." *Id*. at 349 ¶ 31 (emphasis added). On the other hand, the Court speculated that there were circumstances where the provision might not be valid. Specifically, the Court stated that the crime might involve "consensual sex" between two teenagers and, under such a scenario, the fact a "defendant committed the crime would suggest little or nothing about the defendant's danger to anyone." *Id*. ¶ 27. Thus, the Court concluded, even where the proof is evident or the presumption great that a defendant has committed sexual conduct with a minor, detention on this basis "sweeps in situations" where a defendant might not pose a danger to the community. *Id*.

¶49 Thus, setting aside the well-established standard for facial challenges, *Simpson II* struck down a statute that had clear constitutional applications. The bond provision in *Simpson II* limited detention to those cases where the state proved, by the "robust" standard of proof evident/presumption great, *id*. at 346 ¶ 16, that a defendant penetrated a child's anus or vagina with his penis or some object; had oral contact with a child's penis, vulva, or anus; or engaged in masturbation with a child's

MORRENO v. HON. BRICKNER/STATE
JUSTICE GOULD, joined by JUSTICE LOPEZ, Dissenting in Part and
Concurring in the Result

penis or vagina. *See* A.R.S. §§ 13-1405(A), –1401(A)(1), (4). In passing this constitutional provision, the people of Arizona made a judgment that, under these limited circumstances, a legitimate and compelling purpose — protecting children from severe sexual abuse — was served by temporarily detaining a defendant pending trial. At a minimum, this constitutional provision survives a facial challenge. Indeed, it is reasonable to conclude that in those cases where the proof is evident/presumption great that a thirty, forty, or fifty-year-old defendant sodomizes a five-year-old or has sexual intercourse with an eight-year-old, he may, if released before trial, pose a danger to his victim or other children in the community. *See State v. Furgal*, 13 A.3d 272, 279 (N.H. 2010) (stating that New Hampshire's no bond procedure is limited to the "most serious offenses"; the procedure reflects the fact "[t]he legislature has made a reasoned determination that when 'the proof is evident or the presumption great,' the risk to the community becomes significantly compelling, thus justifying the denial of bail.").

**¶50** Despite the "many instances" where the subject bond provision would protect the community by detaining dangerous sex offenders, *Simpson II* focused on one hypothetical situation — "consensual sex" between teenagers — in rendering the statute invalid on its face. Of course, this "consensual sex" hypothetical is based on a legal impossibility; a child under the age of fifteen cannot consent to such acts. *See State v. Fischer*, 219 Ariz. 408, 414–15 ¶ 20 (App. 2008) (stating that consent is not an element of the offense of sexual conduct with a minor, and that a defendant may commit the crime "regardless of a minor's purported consent"). Moreover, the defendants in *Simpson II* certainly did not fall into the Court's hypothetical scenario; they were middle-aged men who repeatedly sexually abused young children. But, more fundamentally, the Court departed from well-established law and struck down the provision as overbroad because it could conceivably "sweep in" defendants who did not pose a danger to the community.

**¶51** At bottom, *Simpson II* adopted the flawed analysis used in *Lopez-Valenzuela*. There, the court struck down a state constitutional provision ("Proposition 100") denying bail for undocumented immigrants charged with any of a broad range of felonies. *Lopez-Valenzuela*, 770 F.3d at 791. *Lopez-Valenzuela* took some extraordinary liberties in construing *Salerno*, including some interpretations that were expressly rejected by *Simpson II.* For example, *Lopez-Valenzuela* construed *Salerno* as applying

MORRENO v. HON. BRICKNER/STATE
JUSTICE GOULD, joined by JUSTICE LOPEZ, Dissenting in Part and
Concurring in the Result

strict scrutiny to detention statutes. *Id.*, at 791. *Simpson II* recognized, of course, that "*Salerno* did not require this standard." *Simpson II*, 241 Ariz. at 348 ¶ 23.

¶**52**    *Simpson II* also disagreed with *Lopez-Valenzuela*'s conclusion that *Salerno* required "all statutory bail schemes" to include the specific procedural safeguards contained in the Bail Reform Act to satisfy due process. *Id.*, at 347 ¶ 21. Rather, *Simpson II* recognized that in *Salerno* the United States Supreme Court "found that the Bail Reform Act's safeguards 'are more exacting' and 'far exceed' those found sufficient in other contexts." *Id.*, at 347 ¶ 21 (citing *Salerno*, 481 U.S.at 752). In support of this conclusion we also cited the following holding from *Furgal*, 13 A.3d at 278-79: "[w]e do not read *Salerno* to hold that all statutory bail schemes must include an individualized inquiry into a defendant's dangerousness in order to pass constitutional muster." *Simpson II*, *Id.*

¶**53**    Unfortunately, *Simpson II* also adopted several holdings from *Lopez-Valenzuela* that find no basis in *Salerno*. One of the most striking examples is *Simpson II's* reliance on the notion that any offense-based, categorical bond provision must be based on a crime that is a "convincing proxy for unmanageable flight risk or dangerousness." *Id.*, at 348-49 ¶¶ 25-26. This standard was derived from *Lopez–Valenzuela*. 770 F.3d at 786. Of course, the idea of a crime constituting a "convincing proxy" for dangerousness is not found anywhere in *Salerno*. Rather, in creating this novel test, *Lopez–Valenzuela* relied on *United States v. Kennedy*, 618 F.2d 557, 558–59 (9th Cir. 1980), which noted that "capital offenses may be made categorically nonbailable because '*most* defendants facing a possible death penalty would likely flee regardless of what bail was set.'" (emphasis added). However, with no explanation, *Lopez–Valenzuela* modified this statement from *Kennedy*, concluding that a crime was not a "convincing proxy" for an "unmanageable flight risk" so long as "*many*" defendants did not pose a flight risk. *Id.*, at 785. (emphasis added). *Simpson II* then decided to raise the bar even higher, concluding that a crime is not a convincing proxy for dangerousness unless "all" defendants charged such a crime pose a danger to the community. *Id.*, at 348-49 ¶¶ 26-27, 30-31.

¶**54**    Additionally, *Simpson II* set aside *Salerno's* standard for facial challenges and adopted *Lopez-Valenzuela's* overbreadth standard. In crafting its own novel standard for reviewing a facial challenge outside the First Amendment, *Lopez-Valenzuela* held that:

MORRENO v. HON. BRICKNER/STATE
JUSTICE GOULD, joined by JUSTICE LOPEZ, Dissenting in Part and
Concurring in the Result

> [E]ven if *some* undocumented immigrants pose an unmanageable flight risk or undocumented immigrants on average pose a greater flight risk than other arrestees, [the provision] plainly is not *carefully limited* because it employs an *overbroad, irrebuttable presumption* rather than an individualized hearing to determine whether a particular arrestee poses an unmanageable flight risk.

*Id.* at 784 (second and third emphases added). Applying this standard, *Lopez-Valenzuela* concluded that Prop 100 violated due process because it "employs a profoundly *overbroad irrebuttable presumption*, rather than an individualized evaluation, to determine whether an arrestee is an unmanageable flight risk." *Id.* at 791 (emphasis added).

¶55 Apart from *Lopez-Valenzuela*, the majority attempts, without success, to find cases that support *Simpson II*. For example, its citation to *Patel* is misplaced. In *Patel*, a group of motel operators brought a facial challenge to a municipal code provision requiring them to provide certain guest records to the police. *Id.* 135 S. Ct. at 2447-48. In response to this facial challenge, the City argued that there were situations where searches authorized by the code provision were constitutionally valid. Specifically, the City argued that a search of guest records would be valid if based on consent, exigent circumstances, or a search warrant. *Id.* at 2450-51.

¶56 Applying the *Salerno* standard, *Patel* stated that a party seeking facial relief must show "that no set of circumstances exists under which the [statute] would be valid." *Id.* at 2450. (quoting *Salerno*, 481 U.S. at 745). *Patel* concluded the motel operators met this standard, because the only valid applications urged by the City were irrelevant to its constitutional analysis. While the City's proposed applications (a search warrant, consent or exigent circumstances) provided constitutional grounds for obtaining a guest's hotel records, such searches were not regulated or authorized by the code provision itself. *Id.* at 2450-51. Thus, *Patel* emphasized that "the proper focus of the constitutional inquiry" must be those "applications of the statute in which it actually authorizes or prohibits conduct," and "not those for which it is irrelevant." *Id.* at 2451 (internal citations omitted).

¶57 *Patel* provides no support for *Simpson II*. *Patel* applied *Salerno's* standard for facial challenges; it did not apply *Simpson II's* overbreadth analysis. Additionally, unlike *Patel*, *Simpson II* addressed

MORRENO v. HON. BRICKNER/STATE
JUSTICE GOULD, joined by JUSTICE LOPEZ, Dissenting in Part and
Concurring in the Result

relevant applications of the subject bond provision. Stated another way, *Simpson II* did not address circumstances where a defendant was being held without bond on grounds that were neither regulated nor authorized by article 2, section 22(A)(1), of the Arizona Constitution. Rather, the Court addressed circumstances that fell squarely within the terms of the subject constitutional provision: the denial of bail to defendants charged with sexual conduct with a minor under the age of fifteen when the proof was evident/presumption great that they committed the crime.

**¶58** The majority also claims that *Simpson II* is consistent with other cases where the United States Supreme Court has invalidated laws "that categorically denied important, protected interests, regardless of the particular circumstances." *See supra* ¶ 18. I agree that, as a general matter, the United States Supreme Court has struck down laws categorically denying important rights. However, I am not sure what relevance this broad statement has to this case. This general proposition certainly does not provide a justification for abandoning *Salerno* or abrogating the United States Supreme Court's well-established rule that facial challenges based on overbreadth are restricted to the First Amendment. *See supra* ¶ 43.

**¶59** Moreover, what is relevant here is that the United States Supreme Court has upheld categorical pretrial detention statutes as constitutional. *Salerno* itself recognized that bond may be categorically denied in a capital case. *Salerno*, 481 U.S. at 753; *see also Simpson II*, 241 Ariz. at 345, 349 ¶¶ 10, 26 (recognizing that pretrial detention is permitted for capital crimes and sexual assault); *Demore v. Kim*, 538 U.S. 510, 517–18, 521, 523, 531 (2003) (holding that a categorical approach detaining undocumented immigrants during deportation proceedings who had been convicted of an "aggravated felony" did not violate due process); *cf. Jennings v. Rodriguez*, 138 S. Ct. 830, 846–47 (2018) (recognizing that under 8 U.S.C. § 1226(c), undocumented immigrants are ineligible for release based on the commission of certain enumerated offenses).

**¶60** While liberty, in its broadest sense, is fundamental, the nature of the right is constrained by the circumstances of each case. Persons "may face substantial liberty restrictions as a result of the operation of our criminal justice system," including arrest and detention of an individual suspected of committing a crime "until a neutral magistrate determines whether probable cause exists," incarcerating an "arrestee" "until trial if he presents a risk of flight," and detaining a defendant who poses "a danger

MORRENO v. HON. BRICKNER/STATE
JUSTICE GOULD, joined by JUSTICE LOPEZ, Dissenting in Part and
Concurring in the Result

to witnesses." *Salerno*, at 749. Indeed, the fact that every defendant charged with a felony is subject to some pretrial release restrictions demonstrates that once a person is charged with a crime, his liberty interest is reduced. *See* A.R.S. § 13-3967(E)(2) (stating that in cases where a defendant has committed a sex offense, he is prohibited "from having any contact with the victim"); Ariz. R. Crim. P. 7.3(a)(1) (stating that "every order of release must contain" a restriction the defendant not leave the state "without the court's permission"). The majority recognizes this principle when, in reference to the On-Release provision, it states "[t]he defendant's liberty interest . . . is *reduced*, because it was already restricted by his arrest and release under conditions for the first charge." *Supra* ¶ 32 (emphasis added).

¶61 Thus, before a court can consider a due process challenge, it must first identify the nature of the liberty interest at stake. *See Washington v. Glucksberg*, 521 U.S. 702, 722 (1997) (stating a court must carefully formulate the liberty interest at stake in substantive due process cases); *cf. Demore*, 538 U.S. at 521, 523 (recognizing that while "the Fifth Amendment entitles aliens to due process of law in deportation proceedings," "[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens" (internal quotation marks omitted)); *Schall v. Martin*, 467 U.S. 253, 264–65 (1984) (explaining that a juvenile's liberty interest in "freedom from institutional restraints . . . is undoubtedly substantial . . . . But that interest must be qualified by the recognition that juveniles, unlike adults, are always in some form of custody.") (citation omitted); *cf. Morrissey v. Brewer*, 408 U.S. 471, 481–82 (1972) ("[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." (quoting *Cafeteria & Rest. Workers Union v. McElroy*, 367 U.S. 886, 895 (1961)).

¶62 *Salerno* illustrates this point. There, the Court did not analyze a defendant's liberty interest in the context of some generalized liberty interest. Rather, it focused on a defendant's liberty interest in the context of a temporary, pretrial detention where he is charged with a serious crime and the "the Government [has proved] by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community." *Salerno*, 481 U.S. at 750–51. The Court

MORRENO v. HON. BRICKNER/STATE
JUSTICE GOULD, joined by JUSTICE LOPEZ, Dissenting in Part and
Concurring in the Result

concluded that "*[u]nder these circumstances*, we *cannot* categorically state that pretrial detention 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Id*. at 751 (emphasis added) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105 (1934). In short, the Court concluded that temporary pretrial detention under the Bail Reform Act did not implicate a fundamental right. *Cf. Glucksberg*, 521 U.S. at 720–21 (stating due process "protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition'") (quoting *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977)).

**¶63** The majority's reliance on *Stanley v. Illinois*, 405 U.S. 645 (1972) is misplaced. Unlike *Salerno*, *Stanley* did not involve a statute where a defendant charged with committing a serious felony is temporarily detained pending trial. Rather, in *Stanley*, the statute at issue permanently deprived all unwed fathers of custody of their children. 405 U.S. at 649–51. The statute presumed, without the benefit of a hearing, evidentiary showing, or even an allegation of parental unfitness, that *all* unwed fathers were unfit parents. *Id*. at 650. Thus, the issue was not whether the existing statute was deficient in protecting the rights of some fathers; rather, *Stanley* addressed a statute permanently depriving an entire class of citizens of their parental rights without *any* procedural protections. *See also Foucha v. Louisiana*, 504 U.S. 71, 81-83 (1992) (distinguishing the reduced liberty interest identified in *Salerno* from the total deprivation of liberty occurring under a Louisiana statute where persons, who were not charged with any crime, were detained indefinitely in a psychiatric hospital, despite the fact they were not suffering from a mental illness and could only be released by proving to the court they were not dangerous).

### B.

**¶64** In fidelity to *Simpson II*, the majority once again abandons *Salerno* and applies the novel *Lopez-Valenzuela* overbreadth standard to analyze Morreno's facial challenge. *See supra* ¶¶ 14–16, 18. While the majority strives to distinguish the On-Release provision from the offense-based provision in *Simpson II*, I do not think it can for one simple reason: no categorical bond provision can survive scrutiny under the *Simpson II* overbreadth standard. Indeed, even *Simpson II's* holding that capital murder and sexual assault provide a convincing proxy for dangerousness collapse under the weight of the overbreadth standard,

MORRENO v. HON. BRICKNER/STATE
JUSTICE GOULD, joined by JUSTICE LOPEZ, Dissenting in Part and
Concurring in the Result

because it is always *possible* to think of factual scenarios where such offenses may not "inherently" predict future dangerousness or provide a reliable "proxy for dangerousness." *See Simpson II*, 241 Ariz. at 348–49 ¶¶ 26–27, 30.

**¶65** Applying *Simpson II* to the On-Release provision demonstrates this point. The majority first claims that the On-Release provision has a different purpose (preventing recidivism) than *Simpson II* (protecting the victim and the community). It then concludes that the On-Release provision, unlike the provision in *Simpson II*, is narrowly focused on accomplishing this purpose because it only applies to (1) defendants "who are charged with felonies committed while on release from a prior felony charge, and (2) the state must show the "proof is evident or the presumption great" the defendant committed the new felony. *Supra* ¶ 31.

**¶66** But is a defendant who commits a new felony while on pretrial release for another felony *always* a risk to recidivate? Stated another way, are there factual scenarios where a defendant might not conceivably pose a risk to re-offend, and yet is "swept in" by the "overbroad" On-Release provision? Undoubtedly, we can speculate about such scenarios. As one example, consider a defendant who is arrested and charged for possessing marijuana. After he is arrested and booked into jail, the judge releases him on his own recognizance. The defendant is then picked up by his girlfriend, who is driving his car. Unfortunately, the defendant left his marijuana pipe in the car, and fifty feet from the jail a police officer pulls him over for a broken tail light. Defendant consents to a search of the car, the pipe is discovered, and defendant is charged with a new felony: possession of drug paraphernalia. Does the defendant's arrest for this new felony indicate he is a risk to commit new felony crimes while on pretrial release?

**¶67** Of course, like the "consensual sex" scenario in *Simpson II*, this hypothetical stands the test for a facial challenge on its head. Rather than the *defendant* establishing there are no circumstances where the On-Release provision would be valid, an overbreadth analysis invites a court to speculate about circumstances where the law might *not* operate constitutionally.

MORRENO v. HON. BRICKNER/STATE
JUSTICE GOULD, joined by JUSTICE LOPEZ, Dissenting in Part and
Concurring in the Result

**¶68**　　　　To be clear, I think the On-Release provision is constitutionally valid because Morreno has failed to make a successful facial challenge under *Salerno*. The On-Release provision is narrowly focused on its purpose of preventing crime because, in many circumstances, when a defendant commits a new felony while on release it "strongly suggests recidivist tendencies." *Supra* ¶ 30. Thus, Morreno cannot show that there is "no set of circumstances exists under which" the On-Release provision would be valid. *Salerno*, 481 U.S. at 745. The point, however, is that the On-Release provision is valid using the *Salerno* standard; it can never be valid using the *Simpson II* standard.

**¶69**　　　　Applying the *Salerno* standard does not, as Morreno contends, leave him without a remedy. He can assert, just as he did here on the grounds of facial invalidity, that the On-Release provision is unconstitutional as applied to him. *Cf. Schall*, 467 U.S. at 273 ("It may be, of course, that in some circumstances detention of a juvenile would not pass constitutional muster. But the validity of those detentions must be determined on a case-by-case basis."); *Hernandez v. Lynch*, 216 Ariz. 469, 481 ¶ 47 (App. 2007) (Kessler, J., concurring) (stating that defendant challenging his detention under former Proposition 100 was not precluded from making an as-applied challenge). Under such a challenge, this Court need not speculate about other cases or situations where the On-Release provision may or may not violate due process. Rather, we need only consider whether a *particular* defendant's constitutional rights were *actually* violated.

**¶70**　　　　Ultimately, I am concerned that *Simpson II's* overbreadth analysis will open the floodgates to facial challenges. *Simpson II* may well require courts in this state to consider an increasing number of facial challenges asserted by parties who have not and cannot show that a statute is unconstitutional as to them. Rather, such litigants may seek to invalidate a statute because it may conceivably violate the constitutional rights of someone else who is not before the court — whether that person actually exists or is simply a hypothetical construct designed to invalidate the statute. Of course, this will require courts in many instances to speculate about the validity of an entire statutory scheme or a constitutional provision without the benefit of a developed factual record or concrete facts.

**¶71**　　　　To avoid this unworkable scenario, the United States Supreme Court has adopted a very demanding standard for facial challenges. While it is not impossible, making a successful facial challenge

MORRENO v. HON. BRICKNER/STATE
JUSTICE GOULD, joined by JUSTICE LOPEZ, Dissenting in Part and
Concurring in the Result

is extremely difficult; indeed, it is "the *most* difficult challenge to mount successfully." *Salerno*, 481 U.S. at 745 (emphasis added); *see also Patel*, 135 S. Ct. at 2447, 2451 (concluding that because there were no relevant circumstances under which the subject municipal code was valid, it was facially invalid). Thus, because I think it is wise to apply the *Salerno* standard to facial challenges, and, because I do not believe *Simpson II* follows that standard, I dissent.